[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-14257
_____

D.C. Docket No. 0:11-cv-60957-MGC

ROBERT RIMMER,

Petitioner - Appellant,

versus

SECRETARY, FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL, STATE OF FLORIDA,

Respondents - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(July 25, 2017)

Before HULL, MARCUS, and WILLIAM PRYOR, Circuit Judges.

HULL, Circuit Judge:

Florida death row inmate Robert Rimmer appeals the district court's denial of his 28 U.S.C. § 2254 petition for writ of habeas corpus.  At issue in this appeal is Rimmer's claim that the prosecution failed to disclose evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963), and that therefore he is entitled to a new trial as to his convictions.  After review and with the benefit of oral argument, we conclude that the state court's denial of Rimmer's Brady claim is entitled to deference under the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") and that the state court's denial was neither an unreasonable determination of the facts nor an unreasonable application of clearly established federal law.  Accordingly, we affirm the district court's denial of Rimmer's § 2254 habeas petition.

## I.  BACKGROUND

To place Rimmer's Brady claim in context, we review the evidence and procedural history of this case.

### A.    Armed Robbery and Murders

On May 2, 1998, Rimmer and codefendant Kevin Parker robbed Audio Logic, a car stereo store in Wilton Manors, Florida.[1]  Rimmer v. State, 825 So. 2d 304, 308-09 (Fla. 2002) (per curiam) ("Rimmer I").  During the armed robbery, Rimmer, who was thirty years old at the time, used a .380 caliber semiautomatic

---

[1]A third man involved in the armed robbery was never identified.  Rimmer v. State, 825 So. 2d 304, 309 n.1 (Fla. 2002).

2

pistol to shoot and kill two Audio Logic employees, Aaron Knight and Bradley Krause. Id. at 309. Rimmer shot both victims from point blank range in a brutal fashion. Id.

Before the shootings, the two murder victims, Knight and Krause, and two customers, Joe Moore and Louis Rosario, were forced to lie face down on the floor of the Audio Logic installation bay area. Id. Knight's, Krause's, Moore's, and Rosario's hands were duct taped behind their backs. Id. While these four men were bound on the floor, another customer, Kimberly Davis Burke, walked into the installation bay area with her two-year-old daughter. Id. When Davis Burke saw what was happening, she immediately sat on the floor with her daughter in her lap. Id. Davis Burke watched as robbers Rimmer, Parker, and an unidentified third man then loaded stereo equipment into a Ford Probe. Id.

At some point during the armed robbery, Rimmer asked Knight, who was face down on the floor with his hands taped behind his back, for the keys to the cash register. Id. Rimmer also asked whether anyone there owned a weapon. Id. Knight told Rimmer where he kept a Walther PPK, which Rimmer took. Id. One of the robbers also took Moore's wallet and cell phone. Id.

Before leaving Audio Logic, Rimmer said to Knight, "You know me," but Knight responded that he did not. Id. Rimmer replied, "You do remember me," then placed the pistol to the back of Knight's head and shot Knight. Id. Rimmer

3

then shot Krause in the back of the head while Krause was also face down on the floor. Id.

Knight died instantly. Id. at 310. Krause was still alive when police arrived at Audio Logic but later died at the hospital. Id. At the scene of the armed robbery and murders, police recovered shell casings and a spent projectile fragment from a .380 caliber firearm. Id. According to the surviving victims, the entire frightening episode, including the armed robbery and the two murders, lasted fifteen to twenty minutes. Id. at 309-10.

**B.    Rimmer's Arrest**

Two days later, on May 4, 1998, eyewitness Davis Burke described the shooter to a sketch artist. Id. at 310. Police sent the artist's sketch to Mike Dixon, Audio Logic's owner, who sent it to John Ercolano, the owner of a separate audio electronics shop. Id. As explained later, Rimmer had previously taken his car to both businesses for work on his car audio system. Id. Ercolano recognized Rimmer as the person depicted in the sketch. Id. Using Audio Logic's customer records, police ascertained Rimmer's identity, phone number, and address. Id.

On May 8, 1998, police showed eyewitnesses Moore and Davis Burke a photographic lineup, and Moore and Davis Burke separately identified Rimmer as the shooter. Id. Later, Moore and Davis Burke separately identified Rimmer from

4

a live lineup.  Id.  Audio Logic owner Dixon identified Rimmer as having been to Audio Logic before for car speaker installation.  Id.

On May 10, 1998, police arrested Rimmer after Rimmer led them on a high-speed car chase.  Id.  During the car chase, Rimmer threw several items from the Oldsmobile he was driving, including the Walther PPK pistol stolen from Audio Logic, the .380 semiautomatic pistol used in the murders, and eyewitness Moore's wallet.  Id.

Police later discovered that Rimmer owned both the Oldsmobile used in the car chase and a Ford Probe, the make and model of the car used during the armed robbery.  Id.  In Rimmer's Oldsmobile, police found a lease agreement for a storage facility.  Id.  Rimmer had rented the storage unit on May 7, 1998, just five days after the armed robbery and murders.  Id.  After obtaining a search warrant, police searched Rimmer's storage unit and found the stereo equipment stolen from Audio Logic.  Id.  Both Rimmer's and Parker's fingerprints were on the stolen stereo equipment.  Id.  Surveillance footage showed Rimmer renting the storage unit.  Id.

## II.  Prosecution's Trial Evidence of Guilt

On May 27, 1998, Rimmer was indicted on eleven charges:  two counts of first degree murder for the deaths of Krause and Knight, three counts of armed robbery, four counts of armed kidnapping, one count of attempted armed robbery,

5

and one count of aggravated assault.  In January 1999, Rimmer was tried before a jury in the Circuit Court of Broward County, Florida.  Richard Garfield served as Rimmer's guilt phase counsel.

## A.    Eyewitnesses' Descriptions of the Shooter

The jury heard at length about the events leading to the identification of Rimmer as the shooter.  After the crime took place, the eyewitnesses first gave physical descriptions of the shooter, all describing the shooter as a black male wearing a baseball cap.  Davis Burke, for example, described the shooter as a black male, five feet and eight or nine inches tall, weighing 175 pounds or less, and wearing a baseball cap pulled down to his eyes.  Similarly, Moore described the shooter as a black male, five feet and seven, eight, or nine inches tall, weighing around 150 or 160 pounds, and wearing a hat.  Both Davis Burke and Moore testified that the shooter was not wearing glasses.

Rosario also stated that the shooter was a black male wearing a baseball cap pulled down almost to his nose, but Rosario described the shooter as taller, between six feet and six feet and two inches tall.

## B.    Composite Sketch

As noted earlier, eyewitness Davis Burke met with Deputy John McMahon, a police forensic artist, to help make a composite sketch of the Audio Logic shooter.  Rimmer I, 825 So. 2d at 310.

6

Sketch artist Deputy McMahon testified that, when he creates a composite sketch, he first shows the eyewitness a series of random photographs, some in color and some in black and white.  According to Deputy McMahon, this allows the eyewitness to select certain facial characteristics from the random photographs so that McMahon can incorporate those features into the composite sketch.  Two days after the murders, on May 4, 1998, McMahon went through this process with eyewitness Davis Burke to create a composite sketch of the Audio Logic shooter.  Deputy McMahon later showed the resulting sketch to eyewitness Moore, who told Deputy McMahon that the sketch adequately resembled the shooter.

## C.    Use of the Composite Sketch to Identify Rimmer

Sometime between May 4 and May 8, 1998, the police faxed a copy of the composite sketch to Audio Logic owner Dixon.  Dixon in turn faxed the composite drawing to Ercolano, who also had an audio electronics shop.  When Ercolano saw the composite sketch, Ercolano believed that it resembled a man (later identified as Rimmer) who had come into Ercolano's store sometime before the Audio Logic murders.  Ercolano testified that this man (later identified as Rimmer) had complained that his car audio system, which Audio Logic had installed, was not working properly.

When Ercolano saw the composite sketch and realized that it looked like Rimmer, Ercolano contacted Dixon, Audio Logic's owner.  This prompted Dixon

7

to review his customer records, through which he learned that Rimmer came to Audio Logic in December 1997 to have a car audio system installed.

As to his prior contact with Rimmer, Dixon testified that, during the latter part of 1997, he met with Rimmer on three occasions at a separate Audio Logic location in Davie, Florida, where the two discussed installing an audio system in Rimmer's Oldsmobile. Because the Davie store was too busy, Dixon sent Rimmer to the Audio Logic location in Wilton Manors to have the system installed. Wilton Manors was the site of the robbery and murders. Rimmer I, 825 So. 2d at 308.

After the installation was complete, Rimmer came to see Dixon again at the Davie store to complain about issues with the system. Dixon worked on Rimmer's audio system at the Davie Audio Logic location.

## D.    Photographic Lineups

On May 8, 1998, Wilton Manors Police Detective Anthony Lewis met separately with eyewitnesses Moore and Davis Burke to show them a photographic lineup, which included the pictures of six black males. Detective Lewis first showed the lineup to Moore, telling Moore that one of the men pictured in the lineup might have committed the robbery and murders at Audio Logic. Detective Lewis and Moore were the only people in the room when Moore viewed the lineup. Moore picked Rimmer and then initialed and dated the lineup document.

8

Detective Lewis then separately showed Davis Burke a different, clean copy of that same photographic lineup, telling Davis Burke that one of the six men in the lineup might have committed the murders at Audio Logic. Detective Lewis and Davis Burke were the only people in the room when Davis Burke viewed the lineup. From that lineup, Davis Burke "picked two pictures that seemed to . . . resemble the person that [she] thought committed the crime." Davis Burke picked photo number six first but also said that the man pictured in photo number three could be the person who committed the murders. Davis Burke explained that she thought the individuals in both of those photos resembled the man who shot Knight and Krause. Davis Burke wrote her initials and the date by both photo number three and photo number six.

After Davis Burke selected photos three and six, Detective Lewis told Davis Burke that Moore had picked photo number three, which was a picture of Rimmer. Detective Lewis then took a formal tape recorded statement from Davis Burke. In that statement, Davis Burke explained that, after Detective Lewis told her that Moore picked photo number three, she looked at her two selections more closely and decided that photo number three was her choice.

Later on May 8, 1998, Detective Lewis showed Dixon a different, clean copy of the same photographic lineup that he had shown to Moore and Davis Burke. Dixon identified Rimmer as the person he had met with on various

9

occasions at the Davie Audio Logic store.  Dixon then dated and initialed the photo.

Detective Lewis also showed the photographic lineup to Rosario, but Rosario was unable to identify the shooter from that lineup.

On May 9, 1998, Detective Lewis sought and obtained a warrant for Rimmer's arrest.

### E.    Evidence Recovered During the High Speed Chase

After obtaining an arrest warrant, Detective Lewis requested assistance from area law enforcement agencies with locating Rimmer.  On May 10, 1998, Fort Lauderdale police located Rimmer while he was driving his Oldsmobile.  Police officers tried to stop Rimmer, but Rimmer led them on a twelve-minute high-speed chase through Fort Lauderdale.  Detective Kenneth Kelley, an officer with the Fort Lauderdale police department, testified that during the May 10, 1998 car chase, he saw Rimmer throw several items from his car window.  Other officers testified that they recovered the items thrown from Rimmer's Oldsmobile, including victim Moore's wallet, which contained Moore's driver's license, the Walther PPK pistol (stolen from Audio Logic), and a .380 Baikal pistol (used as the murder weapon).[2]

---

[2]The trial transcript reflects that the .380 pistol recovered after the car chase was a "Vikale," but this was likely a misspelling of "Baikal," which is the name of a Russian-manufactured .380 pistol.

10

See Rimmer I, 825 So. 2d at 310.  Rimmer eventually left his Oldsmobile and tried to run on foot, but the police overtook and arrested him.

## F.    Live Lineups

On July 13, 1998, Detective Lewis showed eyewitnesses Moore and Davis Burke and Audio Logic's Dixon a live lineup of six individuals, including Rimmer. Davis Burke, Moore, and Dixon each viewed the lineup independently, outside the presence of the other witnesses.  Each of them identified Rimmer as the shooter from the Audio Logic murders.  Rosario was unable to identify the shooter from a live lineup.

## G.    Storage Unit and Stolen Audio Equipment

Bonnie Shinn was the property manager at the storage facility where Rimmer stored the items stolen from Audio Logic.  Shinn testified that Rimmer leased a storage space from her on May 7, 1998.  The prosecution obtained surveillance footage from the storage facility on May 7 and played it for the jury.

While executing a search warrant for Rimmer's Oldsmobile, police found a lease agreement for the storage unit that Rimmer rented.  Police then obtained a search warrant for the storage facility.  On May 14, 1998, while executing the search warrant, police found the property stolen from Audio Logic during the May 2, 1998 robbery.

## H.    Evidence Recovered from Audio Logic

During the trial, the prosecution introduced as evidence the bullet fragment and shell casings found at the murder scene and the .380 Baikal pistol that Rimmer threw out of his Oldsmobile during the car chase.  The prosecution's firearms expert, Carl Haemmerle, testified that he analyzed one deformed .380 bullet and two .380 shell casings found at the murder scene.  Haemmerle testified that they came from the same weapon.  Haemmerle further testified that the bullet fragment and shell casings (found at the murder scene) were fired from the .380 Baikal pistol that the state had admitted into evidence.

## I.    Fingerprints

Deirdre Bucknor, a latent fingerprint examiner for the Broward County Sheriff's Office, examined fingerprints recovered in relation to the May 2, 1998 Audio Logic crimes.[3]  Bucknor identified twenty four of Rimmer's prints on items

---

[3]Bucknor prepared a Latent Fingerprint Report detailing her analysis of the fingerprints recovered from the crime scene and the stolen Audio Logic equipment.  In addition to Rimmer and Parker, the Latent Fingerprint Report listed three other suspects:  Mangnas Frank St. Louis, Craig Darnell Broughton, and Bernard O'Neal Gilbert.  The report described St. Louis, Broughton, and Gilbert as black males and gave their dates of birth.  In a deposition on January 7, 1999, Bucknor stated that the detective assigned to the investigation told her not to compare the latent prints found at Audio Logic and the storage unit to the fingerprints of Broughton and Gilbert.

Before trial, this Latent Fingerprint Report was given to Rimmer's trial counsel Garfield. Trial counsel Garfield testified at the 3.851 evidentiary hearing that he asked Detective Lewis to tell him about the other three suspects listed on the latent fingerprint report.  Detective Lewis told Garfield that he did not know where the names of these other suspects came from or why these other men were considered suspects.

recovered from the storage unit.  Rimmer I, 825 So. 2d at 310 & n.5.  None of the prints from the Audio Logic crime scene could be linked to Rimmer.

### III.  Rimmer's Trial Evidence

During Rimmer's case-in-chief, Rimmer's wife, Joanne Rimmer, testified that, on the day of the robbery and murders, Rimmer had planned to go fishing with his son.  She also testified that she, not Rimmer, drove the Ford Probe on the day of the robbery and murders.  Rimmer I, 825 So. 2d at 310.

Rimmer also called an expert witness who testified that Rimmer is legally blind without his glasses.  Rimmer wears corrective lenses, and the defense's theory was that Rimmer could not have been the assailant because the person who committed the murders was not wearing glasses.[4]  Rimmer I, 825 So. 2d at 310-11.

In rebuttal, the prosecution presented the testimony of Detective Kelley, who stated that he is also visually impaired but is able to see without his corrective lenses.  Rimmer I, 825 So. 2d at 311.

### IV.  Convictions, Sentence, and Direct Appeal

The jury found Rimmer guilty on all eleven counts.  Rimmer was tried jointly with his codefendant Parker, who participated in the armed robbery but was not the shooter.  Rimmer v. State, 59 So. 3d 763, 771 (Fla. 2010) (per curiam) ("Rimmer II"); see also Parker v. State, 795 So. 2d 1096, 1098 (Fla. Dist. Ct. App.

---

[4]The person depicted in the composite sketch created by Deputy McMahon was not wearing glasses.

2001).  Parker was also convicted on all eleven counts.  Rimmer II, 59 So. 3d at 771; Parker, 795 So. 2d at 1097 n.1.  Rimmer's and Parker's penalty phase proceedings were held separately.[5]  Rimmer II, 59 So. 3d at 771.

On February 25, 1999, by a vote of nine to three, the jury recommended that Rimmer be sentenced to death.  On March 19, 1999, the state trial court followed the jury's recommendation and sentenced Rimmer to death for the murders of Knight and Krause.[6]

On July 3, 2002, the Florida Supreme Court affirmed Rimmer's convictions and sentences on direct appeal.  Rimmer I, 825 So. 2d at 332.  The United States Supreme Court denied Rimmer's petition for writ of certiorari.  Rimmer v. Florida, 537 U.S. 1034, 123 S. Ct. 567 (2002) (mem.).

---

[5]Parker is serving life sentences on his convictions for murder, armed robbery, and kidnapping. Rimmer II, 59 So. 3d at 772 n.4; see also Parker, 795 So. 2d at 1097 n.1.  The state court also sentenced Parker to fifteen years' imprisonment for attempted armed robbery and five years' imprisonment for aggravated assault.  Rimmer II, 59 So. 3d at 772 n.4.  A Florida intermediate appellate court affirmed Parker's convictions and sentences on direct appeal. Parker, 795 So. 2d at 1100.  The Florida Supreme Court denied review.  Parker v. State, 821 So. 2d 299 (Fla. 2002).

[6]The state trial court also sentenced Rimmer for his nine non-capital felony convictions associated with the Audio Logic crimes.  The state trial court found that Rimmer qualified as a "Habitual Violent Felony Offender" because: (1) Rimmer previously had been convicted of felony attempted armed robbery in 1991; and (2) the Audio Logic crimes occurred within five years of Rimmer's release from a prison sentence for that 1991 attempted armed robbery.  The state trial court sentenced Rimmer to life imprisonment for each of the three robbery convictions and four kidnapping convictions, thirty years' imprisonment for the attempted armed robbery conviction, and ten years' imprisonment for the aggravated assault conviction.

14

## V.  State 3.851 Motion and Evidentiary Hearing

On November 5, 2003, Rimmer filed a motion in the Circuit Court of Broward County seeking to vacate his convictions and sentences pursuant to Rules 3.850 and 3.851 of the Florida Rules of Criminal Procedure (hereinafter the "3.851 motion").  Rimmer raised sixteen claims in his 3.851 motion.  The state circuit court held a hearing, pursuant to Huff v. State, 622 So. 2d 982 (Fla. 1993) (per curiam), to determine whether these issues warranted an evidentiary hearing.  See Rimmer II, 59 So. 3d at 772-73.

The state circuit court granted an evidentiary hearing on six of the issues raised in Rimmer's 3.851 motion, including whether the prosecution withheld exculpatory evidence in violation of Rimmer's constitutional rights under Brady.  Rimmer's Brady claim involved one undisclosed report from the Florida Department of Law Enforcement ("FDLE") and one undisclosed report from the Plantation Police Department.  We address these reports in turn.

## A.    FDLE Report

The FDLE report indicated that, on May 13, 1998, the Wilton Manors Police Department ("WMPD") requested FDLE's assistance in investigating the May 2, 1998 Audio Logic murders.  In response to this request, on May 13, 1998, an FDLE agent, Burt Ingram, obtained the driver's license photographs of five individuals suspected of participating in the murders and used these five

15

photographs to create a photographic lineup. These suspects included Rimmer, Parker, Bernard O'Neal Gilbert, Mangnas Frank St. Louis, and Craig Darnell Broughton. This lineup was then turned over to Wilton Manors Detective Lewis to show to the witnesses. There is no evidence that this lineup was ever shown to the eyewitnesses.

With respect to the FDLE report, Rimmer's trial counsel Garfield testified that he was not aware that the FDLE was involved in investigating this case. After seeing the information in the FDLE report, however, trial counsel Garfield testified that the FDLE report would not have provided him with any information he did not already have. First, Garfield testified that portions of the FDLE report pertained only to Parker and not to Rimmer. Second, Garfield noted that he was already aware of the information in the FDLE report regarding video footage of Rimmer loading audio equipment into his storage unit. Third, Garfield stated that the five driver's license photographs—of Rimmer, Parker, St. Louis, Gilbert, and Broughton—and the photographic lineup of these five men offered him no new information.[7]

The FDLE report also included a "Case Opening Profile." Garfield testified that this Case Opening Profile contained some information that was new to him but

---

[7]St. Louis, Gilbert, and Broughton were the same individuals listed as "suspects" in the Latent Fingerprint Report that was given to Rimmer's counsel Garfield before the trial. Thus, Garfield already had a report listing these men as suspects, describing them as black males, and giving their dates of birth.

16

that it was largely a summary of the case, or a "rehash of the [probable cause] that existed." This portion of the FDLE report also indicated that Rimmer was arrested with $600 cash on his person, but the other information available to counsel Garfield indicated that Rimmer was in possession of only $100 cash. According to Garfield, the information in the Case Opening Profile would not have been helpful because it overstated the amount of money Rimmer had.

The FDLE report included a document prepared by FDLE Agent Ingram. In this two-page portion of the report, according to Garfield, Ingram summarized information that he learned from the WMPD. Thus, this portion of the FDLE report did not present any information gathered from an independent FDLE investigation. Garfield confirmed that this portion of the report did not contain any information that was new to him. Finally, Garfield testified that the last two portions of the FDLE report—documents showing that Detective Lewis obtained an arrest warrant and executed search warrants on Rimmer's vehicle—provided him with no information he did not already have.

Peter Magrino, the prosecutor who handled Rimmer's trial, also testified regarding the FDLE report. At the time of Rimmer's trial, Magrino was unaware of whether the FDLE was involved in the investigation of this case. Magrino testified that the information contained in the FDLE report contained no

17

information that was not already contained in the WMPD's police reports, which the defense already had.

### B.      Plantation Police Report About Murder at Meineke

The second undisclosed report was a Plantation Police Report, dated April 27, 1998, that described a separate robbery and murder at a Meineke Muffler store in Plantation, Florida, on April 27, 1998, just days before the May 2, 1998 murders at Audio Logic in Wilton Manors, Florida.

During the Plantation robbery, a man walked into the bay area of a Meineke Muffler store while two employees were working on a customer's car.  The suspect, who was armed with a dark colored revolver, told the employees to "give [him] the money."  One of the employees walked toward a counter to retrieve cash.  When the other employee reached for a rag to clean his hands, the robber shot and killed him.  Before fleeing on foot, the robber took the money from the first employee and a necklace from the customer.  The surviving employee described the robber as a black male, five feet and seven to ten inches tall, with medium build, in his mid-thirties, with close-cropped hair, and wearing gold-rimmed glasses.

The Plantation report noted that the Plantation police considered information pertaining to the Wilton Manors murders while investigating the Plantation murder.  An officer from the Plantation Police Department obtained information

18

about Rimmer, including photographs and fingerprints, from the WMPD to aid in the Plantation murder investigation. When police showed the surviving Meineke employee a photographic lineup including Rimmer, this employee did not identify Rimmer as the shooter. Ultimately, the Plantation police focused their investigation on suspects other than Rimmer. Rodney Thomas was eventually convicted of the Plantation murder and sentenced to life imprisonment.

Rimmer's trial counsel Garfield testified that he never received any information or documents relating to the Plantation murder but that he would not have used this information at trial if he had received it. Based on his review of the Plantation report, Garfield indicated that the information it contained would not have been useful to him at trial.

According to trial counsel Garfield, the Plantation report would only have been helpful if the facts of the Plantation robbery and murder were "strikingly similar" to the facts of the Wilton Manors Audio Logic robbery and murders. But Garfield explained that the Plantation crimes differed from the Wilton Manors Audio Logic crimes in several ways: (1) there was only one perpetrator in the Plantation crimes; (2) the perpetrator in the Plantation crimes used a revolver, whereas Rimmer used an automatic weapon; (3) the perpetrator in the Plantation crimes had the victim walk to the cash register in the store rather than having him lie on the floor; and (4) the Plantation perpetrator fled the scene on foot rather than

19

in a vehicle.  According to Garfield, because the Plantation crimes were so different from the crimes with which Rimmer was charged, this Plantation information would not have been helpful to Rimmer's defense.

Finally, as to the Plantation report, Garfield explained that putting this information in front of the jury to suggest that the Plantation shooter was responsible for the Wilton Manors Audio Logic murders may have been harmful to Rimmer's defense.  Garfield testified that when a defendant suggests that someone else committed the crime for which he is accused, the jury expects the defendant to prove that the other person committed the crime.

## VI.  Denial of State 3.851 Motion and Appeal

After the evidentiary hearing, the state circuit court denied Rimmer's state 3.851 motion as to his Brady claim.

The state circuit court found that Rimmer failed to establish each of the required elements of his Brady claim.  The state circuit court summarized the relevant testimony from the 3.851 evidentiary hearing and determined that parts of the FDLE report "relate only to the codefendant and/or would not have provided [Rimmer] with any useful information that he did not already have."  The state circuit court observed that the information in the FDLE report came from WMPD's own investigation, "that the FDLE reports were a synopsis of the Wilton Manors reports," and "that all the FDLE did was assist in compiling a photo

20

lineup." In effect, all that was new in the FDLE report was that the FDLE had prepared a photographic lineup of five suspects—Rimmer, Parker, St. Louis, Gilbert, and Broughton.

As to the Plantation Report, the state circuit court also stressed that Garfield did "not believe he could have used this information because the crimes are not similar enough to each other[] to get into evidence, and that jur[ies] expect you to prove it was the other person."

After reciting the elements of a Brady claim, the state circuit court determined that Rimmer failed to establish a Brady violation. The state circuit court discussed the elements of a Brady claim, stating:

> To establish a Brady violation, the Defendant must prove: (1) that the State possessed evidence favorable to him; (2) that he did not possess the favorable evidence nor could he obtain it with any reasonable diligence; (3) that the State suppressed the favorable evidence; and (4) that had the evidence been disclosed to him, a reasonable probability that the outcome of the proceedings would have been different. Hildwin v. Dugger, 654 So.2d 107, 109 (Fla. 1995).

The state circuit court found that "[t]he evidence from the hearing does not establish that any of the reports, not provided to the defense, contained favorable evidence." The state circuit court also found that the evidence from the hearing established that the reports "contain[ed] information that the defense already had."

The Florida Supreme Court affirmed the denial of Rimmer's 3.851 motion. Rimmer II, 59 So. 3d at 792. With respect to Rimmer's Brady claim, the Florida

21

Supreme Court expressly agreed with the state circuit court's finding "that the evidence 'does not establish that any of the reports, not provided to the defense, contained favorable evidence'" and that the reports contained evidence that the defense already had.  Id. at 785.

The Florida Supreme Court set out the legal principles governing Brady claims, as established by the United States Supreme Court, as follows:

> In order to demonstrate a Brady violation, Rimmer must show that (1) favorable evidence—either exculpatory or impeaching, (2) was willfully or inadvertently suppressed by the State, and (3) that because the evidence was material, the defendant was prejudiced. Strickler v. Greene, 527 U.S. 263, 281–82, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); see also Way v. State, 760 So.2d 903, 910 (Fla.2000).  To meet the materiality prong, Rimmer must demonstrate a reasonable probability that had the suppressed evidence been disclosed the jury would have reached a different verdict.  See Strickler, 527 U.S. at 289, 119 S.Ct. 1936.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.  See Way, 760 So.2d at 913; see also Strickler, 527 U.S. at 290, 119 S.Ct. 1936.  The remedy of retrial for the State's suppression of evidence favorable to the defense is available when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."  Strickler, 527 U.S. at 290, 119 S.Ct. 1936 (quoting Kyles v. Whitley, 514 U.S. 419, 435, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995)).

Id.  The Florida Supreme Court then said that its "review of factual findings relating to Brady claims is based on whether the trial court's findings are supported by competent, substantial evidence," and that it therefore "gives deference to the court's findings on questions of fact."  Id.  The Florida Supreme Court said that it

"reviews de novo the application of the law and independently reviews the cumulative effect of the suppressed evidence." Id.

The Florida Supreme Court then quoted at length the state circuit court's findings regarding the testimony elicited at Rimmer's 3.851 evidentiary hearing. Id. at 785-86. Relevant here, the Florida Supreme Court quoted the state circuit court's findings regarding: (1) trial counsel Garfield's testimony that the FDLE report would not have provided him with any useful information that he did not already have; (2) prosecutor Magrino's testimony that the FDLE reports were merely a synopsis of information already available to Rimmer; and (3) Garfield's testimony that he could not have used the information in the Plantation report. Id.

After quoting the state circuit court's findings relevant to Rimmer's Brady claim, the Florida Supreme Court concluded: "Rimmer has not proven each of the elements required of a successful Brady claim. In particular, Rimmer has not shown how the evidence would have been exculpatory or impeaching." Id. at 786. Thus, the Florida Supreme Court determined that Rimmer was not entitled to relief under Brady. Id.

## VII.  Federal Habeas Proceedings

On May 2, 2011, Rimmer filed a petition in the United States District Court for the Southern District of Florida, seeking a writ of habeas corpus under 28 U.S.C § 2254. Rimmer raised nine issues in his federal habeas petition, including

23

whether failure to disclose the FDLE and Plantation reports violated his rights under Brady.

On September 29, 2014, the district court denied Rimmer's § 2254 federal habeas petition in its entirety, including his Brady claim.

The district court recognized that the Florida Supreme Court "relied heavily on the testimony of [Garfield] wherein he stated that he would not have used" the information in the two undisclosed police reports. But the district court declined to decide whether to defer to the Florida Supreme Court's decision. Instead, the district court analyzed Rimmer's Brady claim de novo and determined that neither the FDLE report nor the Plantation report was material. Pursuant to Kyles v. Whitley, the district court also considered the FDLE and Plantation reports collectively. See 514 U.S. 419, 435-36, 115 S. Ct. 1555, 1567 (1995). The district court found that, "[c]onsidering [both reports] en masse . . . Rimmer has not shown that those two reports were material as defined by Brady."

In the order denying Rimmer's § 2254 petition, the district court granted a certificate of appealability ("COA") as to Rimmer's Brady claim only: "Whether or not the Florida Supreme Court's determination that the FDLE and Palm Beach County police reports were not exculpatory or impeaching was unreasonable and, if so, were those reports material?" Rimmer filed a motion to alter or amend the judgment, which was denied.

24

On September 23, 2015, Rimmer filed a notice of appeal.  Although the district court's COA listed the FDLE and "Palm Beach County" reports, the district court's <u>Brady</u> order focused on the FDLE and Plantation reports, not the Palm Beach County report.  Rimmer correctly notes that the district court determined that the Palm Beach County report was disclosed and thus could not give rise to a <u>Brady</u> violation.  On appeal, Rimmer and the State address only the FDLE and Plantation reports.  Thus, we hereby correct the COA and discuss those two reports only.[8]

## VIII.  STANDARD OF REVIEW

Under 28 U.S.C. § 2254, as amended by AEDPA, our review is limited.  A federal court may only grant a writ of habeas corpus to a state prisoner on a claim adjudicated on the merits in a state court where the state court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "was based on

---

[8]On April 15, 2016, this Court granted Rimmer's motion to expand the COA to include another issue:  "Whether the district court erred in denying [Rimmer's] claim that his trial counsel rendered ineffective assistance of counsel in the investigation and presentation of mitigating evidence during the penalty phase of [Rimmer's] 1999 trial?"

On June 29, 2017, the Circuit Court for Broward County, Florida vacated Rimmer's death sentence and ordered a new penalty phase proceeding.  The State has advised that it will not appeal that order.  Rimmer agrees that, because these state court proceedings will result in a new sentencing proceeding and because the COA on Rimmer's ineffective counsel claim pertains only to his counsel's performance during the penalty phase of his trial, this issue is now moot and we need not address it.

an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court's decision rises to the level of an unreasonable application of federal law only where the ruling is "objectively unreasonable, not merely wrong; even clear error will not suffice." Virginia v. LeBlanc, 582 U.S. __, __, 137 S. Ct. 1726, 1728 (2017) (per curiam) (quoting Woods v. Donald, 575 U.S. __, __, 135 S. Ct. 1372, 1376 (2015) (per curiam)). This standard is "meant to be" a difficult one to meet. Harrington v. Richter, 562 U.S. 86, 102, 131 S. Ct. 770, 786 (2011).

AEDPA thus "imposes a highly deferential standard for evaluating state-court rulings and demands that state-court decisions be given the benefit of the doubt." Trepal v. Sec'y, Fla. Dep't of Corr., 684 F.3d 1088, 1107 (11th Cir. 2012) (quoting Hardy v. Cross, 565 U.S. 65, 66, 132 S. Ct. 490, 491 (2011) (per curiam)). Pursuant to AEDPA, we must only grant relief where the state court's ruling contained an error so clear that fair-minded people could not disagree about it. Wright v. Sec'y, Fla. Dep't of Corr., 761 F.3d 1256, 1277 (11th Cir. 2014). "We review de novo the district court's decision about whether the state court acted contrary to clearly established federal law, unreasonably applied federal law, or made an unreasonable determination of fact." Trepal, 684 F.3d at 1107 (quoting Johnson v. Upton, 615 F.3d 1318, 1330 (11th Cir. 2010)).

26

## IX.  DISCUSSION

On appeal, Rimmer claims that the Florida Supreme Court's decision denying his Brady claim was contrary to, or an unreasonable application of, clearly established federal law.  We first review the well-established elements of a Brady claim and how the district court erred by conducting de novo review and in not according deference to the Florida Supreme Court's decision denying Rimmer's Brady claim.  Then we accord the required deference and conclude that the Florida Supreme Court's decision denying Rimmer's Brady claim was supported by the record and was not contrary to, or an unreasonable application of, clearly established federal law.

### A.    Brady Principles

As recognized in Brady and its progeny, principles of due process dictate that, in a criminal proceeding, the prosecution must disclose evidence favorable to the defendant.  Brady, 373 U.S. at 87, 83 S. Ct. at 1196-97; Banks v. Dretke, 540 U.S. 668, 691, 124 S. Ct. 1256, 1272 (2004).  To establish a Brady violation, a defendant must prove three essential elements:  (1) that the evidence was favorable to the defendant, either because it is exculpatory or impeaching; (2) that the prosecution suppressed the evidence, either willfully or inadvertently; and (3) that the suppression of the evidence resulted in prejudice to the defendant.  Turner v. United States, 582 U.S. __, 137 S. Ct. 1885, 1893 (2017); Banks, 540 U.S. at 691,

27

124 S. Ct. at 1272; Strickler v. Greene, 527 U.S. 263, 281-82, 119 S. Ct. 1936, 1948 (1999).

To establish prejudice, the defendant must show that the suppressed evidence was material. Banks, 540 U.S. at 691, 124 S. Ct. at 1272. The evidence rises to the level of materiality within the meaning of Brady when there is a reasonable probability that, had the suppressed evidence been disclosed, the result of the proceeding would have been different. Turner, 582 U.S. at __, 137 S. Ct. at 1893. "'A "reasonable probability" of a different result' is one in which the suppressed evidence '"undermines confidence in the outcome of the trial."'" Turner, 582 U.S. at __, 137 S. Ct. at 1893 (quoting Kyles, 514 U.S. at 433-34, 115 S. Ct. at 1565); United States v. Bagley, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383 (1985).

In determining whether disclosure of the suppressed evidence might have produced a different result, we must consider the "totality of the circumstances." Bagley, 473 U.S. at 683, 105 S. Ct. at 3384. "We must examine the trial record, 'evaluat[e]' the withheld evidence 'in the context of the entire record,' and determine in light of that examination whether 'there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different.'" Turner, 582 U.S. at __, 137 S. Ct. at 1893 (citation omitted) (quoting

28

United States v. Agurs, 427 U.S. 97, 112, 96 S. Ct. 2392, 2402 (1976), and Cone v. Bell, 556 U.S. 449, 470, 129 S. Ct. 1769, 1783 (2009)).

## B.    District Court's De Novo Review

At the outset, we explain why the district court erred in conducting de novo review.  As outlined above, the Florida Supreme Court determined that Rimmer failed to establish all elements of a Brady claim.  In doing so, the Florida Supreme Court correctly identified the applicable standard from Brady and its progeny.  The Florida Supreme Court then applied that standard to determine that Rimmer's Brady claim failed, especially with respect to the requirement that the FDLE and Plantation reports be favorable to Rimmer.  Rimmer II, 59 So. 3d at 785-86.

As to Brady's requirements, the district court acknowledged that the Florida Supreme Court had relied, in part, on trial counsel Garfield's testimony that the FDLE and Plantation reports would not have been helpful to Rimmer's defense. But the district court declined to accord deference to that decision because it was "unaware of any clearly established federal law" allowing a state court to rely on trial counsel's testimony—that undisclosed evidence was not helpful—in determining whether that evidence was exculpatory, impeaching, or material. Because no federal law clearly allowed the state court to rely on trial counsel's testimony, the district court reviewed Rimmer's Brady claim de novo and

29

determined that Rimmer's claim failed because the FDLE and Plantation reports were not material.

The district court's analysis was erroneous.  Whether clearly established federal law <u>countenances</u> the state court's approach is of no moment.  Under § 2254, the only relevant inquiry is whether clearly established federal law <u>prohibits</u> the state court from relying on trial counsel's testimony that the undisclosed evidence was not helpful.  28 U.S.C. § 2254(d).  Where the state court's decision is not inconsistent with any clearly established federal law, we must defer to it under AEDPA.

Our § 2254 review also does not turn on the extent to which the state court explained the relevance of Garfield's testimony to the <u>Brady</u> claim.  In deciding to review Rimmer's claim <u>de novo</u>, the district court expressed concern that the Florida Supreme Court did not explain whether Garfield's testimony factored into its <u>Brady</u> analysis.  But our charge under § 2254(d) is to review the conclusion the state court reached, not its reasoning.  See <u>Gill v. Mecusker</u>, 633 F.3d 1272, 1291 (11th Cir. 2011) ("[T]he 'precise question' that must be answered under the AEDPA standard must focus on [the] state court's ultimate conclusion."); <u>Wright v. Sec'y for Dep't of Corr.</u>, 278 F.3d 1245, 1255 (11th Cir. 2002) ("Reading into the statute a requirement that state courts spell out their rationale would run counter to the main thrust of [AEDPA].").

30

Unless we respect AEDPA's onerous standard, we risk "disturb[ing] the State's significant interest in repose for concluded litigation, den[ying] society the right to punish some admitted offenders, and intrud[ing] on state sovereignty to a degree matched by few exercises of federal judicial authority." LeBlanc, 582 U.S. at __, 137 S. Ct. at 1729 (alterations in original) (quoting Harrington, 562 U.S. at 103, 131 S. Ct. at 787). Because the Florida Supreme Court correctly identified the standard under which it was analyzing Rimmer's Brady claim, we review the denial of that claim under the deferential standard set forth in AEDPA. See 28 U.S.C. § 2254(d).

## C.    Our Deferential Review

As to Brady's first requirement that Rimmer show that the undisclosed evidence was favorable to his defense, the Florida Supreme Court's determination—that the information contained in the FDLE and Plantation reports was neither exculpatory nor impeaching—was not unreasonable. Garfield testified that the information in those reports was either duplicative of information of which he already was aware, was of no value to Rimmer's defense, or in fact would have been harmful to Rimmer's defense. In relying on Garfield's testimony to reject Rimmer's Brady claim, the state circuit court treated Garfield's testimony as credible, and the Florida Supreme Court affirmed. See Rimmer II, 59 So. 3d at 785-86. We must defer to the state circuit court's credibility determination, which

31

is a factual finding.  Baldwin v. Johnson, 152 F.3d 1304, 1316 (11th Cir. 1998); see also 28 U.S.C. § 2254(d).  Thus, we credit the state circuit court's determination, and the Florida Supreme Court's affirmance, that Garfield gave a credible assessment when he testified that the FDLE and Plantation reports would not have been helpful to Rimmer's defense.

As to the FDLE report specifically, the Florida Supreme Court also did not make an unreasonable determination when it concluded that this report was neither exculpatory nor impeaching.  As Garfield noted in his testimony, the bulk of the information in the FDLE report pertained to Parker or provided information of which Garfield was already aware.  The only potentially useful information provided in the FDLE report was the names and descriptions of the three other suspects—St. Louis, Gilbert, and Broughton—who police initially considered in investigating the Wilton Manors Audio Logic crimes.  The Latent Fingerprint Report, which was given to Rimmer's trial counsel, already listed these three as suspects, described them as black males, and gave their dates of birth.  That the FDLE report contained their photographs, height, and weight was not favorable or exculpatory as to Rimmer.  In any event, that police considered these other suspects does not impeach the testimony of the eyewitnesses who identified Rimmer as the shooter or otherwise exculpate Rimmer.  Further, the FDLE report does not weaken in any way the strong evidence that Rimmer (1) threw Moore's

32

wallet, the stolen firearm, and the murder weapon from his car and (2) rented a storage unit in which he stored the items stolen from Audio Logic.

It was also not unreasonable for the Florida Supreme Court to determine that the Plantation Report was not favorable to Rimmer. That another robbery and murder occurred in another city at another time does not help Rimmer. In addition, counsel Garfield noted that the crimes in the Plantation Report were different from the Wilton Manors Audio Logic crimes in several critical respects. These differences would have made it difficult for Rimmer to use the Plantation report to suggest that the person who committed those Plantation crimes was responsible for the Wilton Manors Audio Logic crimes instead of Rimmer. And if Garfield was unable to conclusively establish that the Plantation perpetrator was actually responsible for the Wilton Manors Audio Logic crimes as well, then the presentation of this Plantation evidence might well have been harmful to Rimmer's defense.

As to the favorability requirement, Rimmer does not identify any federal case law suggesting that this type of evidence is exculpatory under Brady. Rimmer also does not explain how the state court's decision was contrary to any such federal law. Rimmer only states the general rule that, to be actionable under Brady, the undisclosed evidence must be favorable to the accused. Nothing indicates that the Florida Supreme Court unreasonably applied that general rule to

33

the reports here.  See Harrington, 562 U.S. at 101, 131 S. Ct. at 786 (noting that whether the state court's determination was unreasonable depends on the specificity of the rule applied and that, where the rule is general in nature, the state court has more leeway to reach decisions on a case-by-case basis).  In sum, Rimmer has not shown that the Florida Supreme Court's determination—that the two undisclosed reports were not favorable to Rimmer—was contrary to, or involved an unreasonable application of, clearly established federal law.

As an alternative and independent reason, we hold that the Florida Supreme Court reasonably concluded that the information contained in the FDLE and Plantation reports, individually or collectively, was not material within the meaning of Brady.

Garfield's testimony regarding the largely duplicative and otherwise unhelpful nature of the information in the FDLE and Plantation reports shows that their disclosure would not have been sufficient to change the outcome of the proceedings.  See Kyles, 514 U.S. at 433-34, 115 S. Ct. at 1565.  Even if the information in those two reports might have somehow been useful to Rimmer's misidentification defense, we must consider the entire record, including the strong evidence establishing that Rimmer robbed Audio Logic and was the shooter.  The scant facts included in those reports in no way undermine our confidence in the guilty verdict.  See Bagley, 473 U.S. at 682-83, 105 S. Ct. at 3383-84.

34

The fact that law enforcement initially considered other suspects and the fact that another robbery and murder took place in Plantation, Florida just before the Wilton Manors Audio Logic robbery and murders does not undermine at all the substantial inculpatory trial evidence establishing Rimmer's guilt. Eyewitness Davis Burke provided a description of Rimmer to a sketch artist, who produced a drawing. When Ercolano saw that drawing, he recognized Rimmer, which helped law enforcement to ascertain Rimmer's contact information. Eyewitnesses Moore and Davis Burke picked Rimmer out of a photographic lineup and later chose Rimmer from a live lineup. On the date of his arrest, Rimmer was in possession of Moore's wallet, the Walther PPK pistol stolen during the robbery, and the .380 Baikal pistol used to kill Knight and Krause. The evidence established that Rimmer rented a storage unit where he kept the stereo equipment stolen from Audio Logic on the day of the murders and that Rimmer owned a Ford Probe, which was the make and model of the car used during the crime.

Finally, the Florida Supreme Court's decision did not unreasonably fail to consider the totality of the circumstances in denying Rimmer's Brady claim. The information contained in the FDLE and Plantation reports does not undermine the eyewitness identifications of Rimmer as the shooter. This is true regardless of the fact that Detective Kelley testified about his own personal vision before the jury. Under the totality of the evidence in the record, including the alleged criticism of

35

the eyewitness identifications and any issues with Detective Kelley's testimony, the information in the undisclosed reports does not undermine confidence in the verdict. See Bagley, 473 U.S. at 682-83, 105 S. Ct. at 3383-84.

For all these reasons, the Florida Supreme Court's decision on Rimmer's Brady claim is not based on an unreasonable determination of the facts and is not contrary to, or an unreasonable application of, clearly established federal law. Because the Florida Supreme Court's decision on Rimmer's Brady claim did not contain an error so clear that fair-minded people could not disagree about it, we defer to that decision denying Rimmer relief on his Brady claim. See Wright, 761 F.3d at 1277.

## X.  CONCLUSION

Based on the foregoing, we conclude that Rimmer is not entitled to habeas relief on his Brady claim and affirm the district court's denial of Rimmer's § 2254 petition as to his convictions.

**AFFIRMED.**