[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-10145
_____

D.C. Docket No. 1:13-cv-20863-JEM

DIETER RIECHMANN,

Petitioner-Appellant,

versus

FLORIDA DEPARTMENT OF CORRECTIONS,
ATTORNEY GENERAL OF THE STATE OF FLORIDA,

Respondents-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 7, 2019)

Before ROSENBAUM, GRANT and HULL, Circuit Judges.

HULL, Circuit Judge:

Dieter Riechmann, a Florida state prisoner, appeals the district court's denial of his 28 U.S.C. § 2254 federal habeas corpus petition challenging his convictions for first-degree murder and possession of a firearm during the commission of a felony. This Court granted a certificate of appealability ("COA") on two issues: (1) whether trial counsel provided ineffective assistance by failing to investigate and present available evidence that Riechmann's relationship with the victim was loving and respectful and that he did not "live off" her; and (2) whether the state's failure to disclose to the defense the statements of Swiss and German witnesses interviewed by German police violated Brady v. Maryland, 373 U.S. 83, 83 S. Ct. 1194 (1963). After review, and with the benefit of oral argument, we affirm.

## I.  STATE TRIAL PROCEEDINGS

In 1987, a grand jury indicted Riechmann on charges of premeditated first-degree murder of Kersten Kischnick and use of a firearm during the commission of the murder. Riechmann and Kischnick, "life companions" of 13 years, were German citizens and residents who came to Florida on October 2, 1987, for a vacation. On October 25, 1987, Kischnick was shot to death in Miami Beach while she sat in the passenger seat of the couple's rental car.

At trial, the state's theory of the case was that the victim, Kischnick, was a prostitute who financially supported Riechmann, who was her pimp. When Kischnick decided to quit prostitution, Riechmann killed her to recover valuable

2

life insurance proceeds.  As to the specific facts of the murder, the state sought to prove that Riechmann stood outside the passenger side of the rental car and fired a single shot through the partially open passenger-side window, striking Kischnick in the head and killing her.  Riechmann insisted to police and at trial that a random stranger shot Kischnick when they stopped the car to ask for directions.  He consistently denied committing the crime.

## A.  Pretrial Proceedings

Prior to trial, Riechmann's defense counsel learned that the state was in possession of 37 statements taken by the German police in connection with its parallel investigation of Riechmann.  It appears from the record that defense counsel was in possession of the list of names but not all of the statements themselves.  These were statements of persons in Germany and Switzerland who knew Riechmann and Kischnick.

Riechmann's defense counsel did have the statements of ten of those 37 witnesses—the statements of those who might testify at trial—and he requested copies of the 27 remaining statements.  The state failed to provide the defense with these 27 other statements despite the state trial court's on-the-record ruling that Riechmann was to get "carte blanche discovery . . . . No ifs, ands, or buts.  No conditions.  Whatever the state has he gets."

3

When the prosecutor refused to comply, Riechmann's defense counsel moved the state trial court to conduct an in camera inspection of the statements and turn the relevant statements over to the defense. It does not appear that the state trial court ever ruled on that motion, and Riechmann's trial counsel did not renew it.

Despite learning about the existence of several Swiss and German persons who might have had relevant information about the nature of Riechmann and Kischnick's relationship, defense counsel spoke to no German witnesses prior to trial, nor did he send an investigator to Germany. Riechmann also provided his defense counsel with a handwritten list of persons in Germany to depose or contact, but defense counsel did not contact anyone on the list.

**B. Riechmann and Kischnick's Relationship**

At trial, the government sought to establish the nature of Riechmann and Kischnick's relationship primarily through the testimony of four German witnesses, including Kischnick's sister. These witnesses were culled from the list of 37 German witnesses referenced above.

The first of these witnesses was Peter Carsten Meyer-Reinach, who met Riechmann and Kischnick in Hamburg in 1977. During the time of his acquaintance with the couple, Meyer-Reinach knew Kischnick to be a prostitute

4

and Riechmann to be her pimp.  During that time, Kischnick earned between 1,000 and 1,500 German marks per day as a prostitute.[1]

At some point, Riechmann and Kischnick moved from Hamburg to a German town near the Swiss border, in part because "the work for [Kischnick] . . . wasn't good anymore."  Meyer-Reinach saw Riechmann twice more following the move, and during one of these interactions, Riechmann commented that Kischnick "really didn't feel like working anymore."

The second German witness, Ernst Siegfried Steffen, was an insurance agent in Hamburg who sold various life insurance policies to Riechmann and Kischnick. Steffen too had met Riechmann in Hamburg in 1977, and was aware that Kischnick worked as a prostitute under the name Yvonne.  Riechmann had also told Steffen that Riechmann worked as a pimp.

Steffen confirmed Riechmann and Kischnick maintained a "high standard of living" while in Hamburg, and he believed Kischnick was making about 1,000 German marks per day as a prostitute.  As for Riechmann, Steffen recalled helping him obtain a luxury apartment by verifying a certificate of earnings showing Riechmann made 3,950 German marks per month, though the certificate of earnings did not state the origin of those earnings.  Riechmann also told Steffen that he had received training as an insurance agent.  Like Meyer-Reinach, Steffen

---

[1]Prostitution is, and was at the time of the murder, legal in Germany.

5

was aware that Riechmann and Kischnick had at some point moved to southern Germany near the Swiss border, in part because "[b]usiness apparently wasn't going too well in Hamburg."

The third witness was Kischnick's younger sister, Regina, who first met Riechmann when Kischnick brought him home in 1974. Regina did not learn of her sister's occupation until several years later. During the time that Riechmann and Kischnick lived in Hamburg, Regina never knew Riechmann to work at any particular job, though she recalled Kischnick telling her that Riechmann "had business dealings with Arabs"—specifically, "dealings in gold." Kischnick seemed content, if not happy, in her life with Riechmann in Hamburg, but she became noticeably unhappy upon their move to southern Germany. On the occasions that Regina visited her sister in southern Germany, it did not appear to her that Riechmann was working. Regina learned that Kischnick had gotten married to someone other than Riechmann and obtained a Swiss passport. There were several times when Regina would call the apartment in southern Germany and Riechmann would answer and tell her that Kischnick "was in Switzerland with a girlfriend." Regina often heard Riechmann make derogatory comments about Kischnick's age and figure.

On cross-examination, Regina stated that she believed much of the expensive jewelry and apartment furnishings Riechmann and Kischnick owned had

6

been paid for by Kischnick's earnings. Regina conceded, however, that the couple's earnings likely were supplemented in some way by Riechmann, and that she had no way of definitively knowing the origin of the money used to purchase particular gifts or furnishings.

The final witness was a woman named Dina Mohler, who then worked as a prostitute in Switzerland. Mohler first met Kischnick a few years after Kischnick and Riechmann moved to southern Germany. Kischnick had replied to an advertisement Mohler placed in the newspaper seeking a "colleague" with whom to share her apartment. By "colleague," Mohler meant another prostitute who would pay rent to use the shared space. Kischnick, who worked under the name Yvonne, was supposed to pay Mohler 1,000 Swiss francs per month to use the apartment, but Kischnick was unable to make this payment because she was physically ill and depressed. Specifically, Kischnick was unable to provide services to her customers for large stretches of time because she was suffering from "gynecological problem[s]," which at times were so severe that she doubled over in pain.

Approximately three months after starting to work with Mohler, Kischnick departed for the United States with Riechmann. Not once during those three months with Mohler was Kischnick able to make a full rental payment, and she confided in Mohler that she was earning far less than she had previously.

7

On cross-examination, Mohler admitted that she had never spent any time with Riechmann and Kischnick together, and that she had only spoken to him once briefly on the phone. She acknowledged that Kischnick had always referred to Riechmann as her boyfriend, not her pimp, and consistently denied that she supported him financially, as he "had enough money of his own." Despite the fact that the couple had a "very difficult relationship" and "had a lot of fights," Mohler acknowledged that the two "loved each other." When asked specifically whether Riechmann loved Kischnick, Mohler agreed he did, though "not in the same way she loved him." Mohler never saw Riechmann physically abuse Kischnick, nor had she seen any evidence that Kischnick was abused. Just prior to departing for the United States, Kischnick appeared to be in good health and was looking forward to the trip.

However, on redirect, Mohler stated that: (1) prostitutes often refer to their pimps as boyfriends and never admit to supporting them; (2) Kischnick stated "very often" than she wanted to stop being a prostitute; (3) Riechmann was verbally, if not physically, abusive; and (4) Kischnick would avoid answering any time Mohler asked how Riechmann supported himself.

After the state rested, Riechmann testified on his own behalf and painted a different picture of his relationship with Kischnick. Riechmann acknowledged that Kischnick had at times worked as a prostitute, but he categorically denied being

8

her pimp or having ever been a pimp at all.  According to Riechmann, he was able to support himself and his relatively lavish lifestyle through commodities trading, particularly oil.  Through unspecified means, Riechmann was able to purchase oil for less than the OPEC price and resell it in Europe for a profit.  Riechmann earned a commission of 10 cents per barrel of oil sold.

As for Kischnick's occupation, Riechmann maintained she first got into prostitution as a means of supporting herself while he was serving a ten-month jail sentence for perjury.  Riechmann claimed Kischnick ended up in the clutches of "a gang of pimps," and he subsequently "bought her free" by paying the gang six months' worth of her earnings.   Kischnick later became involved with another gang of pimps when the couple was briefly separated for six months, and Riechmann again purchased her freedom for 50,000 German marks.

During his testimony, Riechmann reiterated his love for Kischnick and recounted numerous times he had saved her life.  The defense also played for the jury a video that Riechmann had taken the night that Kischnick was killed, which depicted the two as being in an apparently loving relationship.

The state trial court allowed the government to impeach Riechmann with evidence of his prior German convictions.  At the trial, the jury heard about Riechmann's convictions for: (1) grand theft of an automobile stolen in 1966; (2) involuntary manslaughter and negligent bodily harm connected with a 1972

9

automobile accident; (3) forgery, which occurred in 1973; and (4) solicitation of perjury, which occurred in 1974.

## C. The Murder

According to Riechmann, he and Kischnick traveled to Miami in 1987 as a vacation. The two had previously visited Miami for a week in 1986. While the ostensible purpose of the 1987 trip was pleasure, Riechmann was also scoping out locations for a designer clothing store he hoped to open in Miami. He and Kischnick also took trips to a shooting range during the 1987 trip. Riechmann loved to shoot and collect guns, which he was unable to do in Germany. Riechmann and Kischnick planned to stay in Miami from October 2 through 31.

Upon arriving in Miami from Germany in October of 1987, Riechmann rented an automobile with his Diner's Club card, which automatically insured both passengers in the event of accidental death.[2] In the event of an accidental death in the vehicle—which included homicide—the deceased's legal heir would receive 500,000 German marks.[3] On the evening of October 25, 1987, following a dinner

---

[2] In 1986, Riechmann and Kischnick had twice traveled to Miami before. On at least one of those trips, Riechmann similarly rented a car using his Diner's Club card.

[3] Records showed that Riechmann and Kischnick had each designated the other as his or her legal heir under the policy. Following Kischnick's murder, the German insurance firm that issued the policy received a letter from Riechmann, claiming entitlement to the 500,000 German marks due to Kischnick's death.

10

out, Riechmann drove around the Miami area with Kischnick in the passenger seat of the rental car. At some point that evening, Kischnick was shot.

When questioned by police—both at the scene on the evening of October 25 and during subsequent conversations—Riechmann consistently claimed Kischnick had been shot by a random stranger. Specifically, Riechmann told officers that he stopped to ask for directions from a black man who asked if they were tourists. Riechmann noticed that the man had something in his hand. Then Riechmann heard an explosion. At that point, Riechmann "hit the accelerator and took off." Riechmann heard Kischnick "wheezing" and realized she had been shot, at which point he rolled up the window and reclined her seat. He eventually spotted a police officer, whom he flagged down. Despite going on multiple "drive arounds" with police in the days following the murder, Riechmann was unable to identify specifically where the shooting took place.

In his trial testimony, Riechmann provided a more detailed account of his version of events. On the evening of October 25, he and Kischnick had dinner and drinks at Bayside in Miami. They left the restaurant at 10:00 p.m., intending to stop at the "Welcome to Miami Beach" sign to take pictures, but they got lost. At that point, the couple stopped at an unspecified location to ask for directions from a stranger. Realizing they were close to their destination, Riechmann unbuckled his seatbelt and reached behind his seat to retrieve his video camera, apparently

11

preparing to use it.  He placed the camera on Kischnick's lap while she searched her purse for a few dollars to tip the stranger.  Riechmann then noticed the stranger had approached the car again and "was holding something in his hand into the car."  Sensing danger and feeling threatened, Riechmann instinctively "hit the gas pedal" and stretched out his arm in a "protective manner."  At the same time Riechmann hit the accelerator, he heard an explosion and saw Kischnick slump over in her seat.  Riechmann then drove around looking for help, eventually spotting a police car and flagging it down.

## D.  Forensic Evidence

At trial, the state presented testimony from three expert witnesses: a gunshot-residue expert, a firearms expert, and a serologist.  The defense also called its own gunshot-residue expert to counter the state's expert.

When questioning Riechmann at the scene, police swabbed Riechmann's hands.  The state's expert analyzed the swabs and identified numerous particles typically found in gunshot residue, the number and nature of which indicated that Riechmann had recently fired a gun.  The expert specifically testified that he would not have expected to find the same number and type of particles on Riechmann's hands if Riechmann had merely sat in the driver's seat while someone else fired a shot from outside the car.  In contrast, the defense's gunshot-residue expert testified that the particles of gunshot residue found on Riechmann's hand proved

12

only that Riechmann was in the vicinity of a gun when it was fired, not that he actually fired a gun.

Upon searching Riechmann's motel room, police found three handguns and 40 Winchester silver-tipped, 110 grain, .38-caliber bullets in a 50-shell box.[4] An expert firearms examiner, who also examined bullet fragments removed from Kischnick's head, testified that the bullets recovered from the motel were the same type as the bullet that killed Kischnick, although none of the specific weapons found in the room were used to commit the murder. However, the bullet that killed Kischnick could only have been fired from one of the following gun models: a .38 Astra, a .38 Special Taurus revolver, or an FIE .38 Special Derringer. Two of those models—the Taurus revolver and the FIE Derringer—were among the three guns recovered from Riechmann's hotel room.

Riechmann claimed to have bought two of the guns on a prior trip to Miami in 1986. During that trip, both Riechmann and the victim took multiple trips to a shooting range, and then left the guns with a local attorney they knew when they returned to Germany. They retrieved the guns from the attorney by October 9, 1987. Riechmann bought the third gun on the 1987 trip. Riechmann claimed he did so because Kischnick saw it in a magazine and liked it. Riechmann also

---

[4]Another two boxes of .38-caliber Winchester ammunition were also discovered in a safety deposit box in Germany. The parties stipulated that Riechmann had purchased the safety deposit box and was the only person who had access to it.

purchased the ammunition on that trip for the two of them to use at the shooting range.

The state also presented testimony from a serologist concerning the blood found in the car and on Riechmann's clothing. The serologist testified that the "high-velocity blood splatter" found on the driver-side door inside the car could not have gotten there if the driver's seat was occupied in a normal driving position when the shot was fired from outside the passenger-side window. Moreover, upon examining Riechmann's clothing, the serologist discovered blood stains, as opposed to high-velocity splatter. Had Riechmann been sitting in the driver's seat during the shooting, his clothes would have shown evidence of blood splatter, rather than blood stains, the serologist stated.

## E. Documentary Evidence

The state also presented several pieces of documentary evidence in support of its theory that Riechmann killed Kischnick to recover insurance proceeds. In addition to establishing that Riechmann was entitled to 500,000 German marks as a result of the insurance policy associated with the rental car, the state presented evidence of five additional insurance policies that were taken out on Kischnick's life between approximately 1978 and 1985 and of which Riechmann was the beneficiary.

14

Specifically, Riechmann had taken out two life insurance policies on Kischnick, each of which insured her life for 200,000 German marks, and one of which provided for double payment in the event of accidental death, which included murder, so long as the murderer was not the beneficiary. Riechmann was the beneficiary of both policies. Riechmann purchased the double-indemnity policy from Ernst Steffen in 1984. Steffen had previously sold Riechmann an accident insurance policy, but Riechmann wanted to cancel that policy and replace it with two risk life insurance policies, one on himself and the other on Kischnick. The risk policy on Kischnick (which was for twice as much as the policy on Riechmann) insured her only from 1984 to 1994, and Riechmann was only able to collect on the policy in the event that Kischnick died within that time frame.

Additionally, in 1980, while Kischnick and Riechmann were separated, Kischnick took out two whole-life policies on herself, which she purchased from Ernst Steffen and which were valued at 29,227 and 29,437 German marks, respectively, at the time of Kischnick's death. Both policies provided for double indemnity in the event of Kischnick's accidental death (which, again, included murder, assuming the murderer was not the beneficiary). Kischnick's parents were the original beneficiaries on both policies, but in 1983, the insurance company received Change of Beneficiary forms designating Riechmann as the new beneficiary on both policies.

15

Finally, Riechmann, through his Diner's Club membership, applied for an accidental death and disability policy, which provided for a payout of 500,000 German marks to Riechmann in the event of Kischnick's death.[5]  Following Kischnick's death, Riechmann attempted to collect on at least four of these insurance policies.  All told, Riechmann stood to gain the equivalent of over $961,000 in the event of Kischnick's accidental death.  During his testimony, Riechmann claimed to have been unaware that the total payout would be so high.  Riechmann claimed he was not aware that murder qualified as an accidental death under the various policies, nor was he aware of the automatic coverage associated with the rental car.

The state also submitted copies of Riechmann and Kischnick's reciprocal wills, in which each was named as the other's sole heir.  Evidence showed that the wills were filed in a German court in June of 1987.  Riechmann claimed, during his testimony, that it was Kischnick who wanted to file the reciprocal wills.

---

[5]The two insurance companies that issued the term life insurance policies also issued policies on Riechmann's life for which Kischnick was the beneficiary, though the payout in the event of her death was twice as high.  Riechmann also claimed that he had two additional policies taken out on his life—one for 100,000 marks and another for 30,000 marks—for which Kischnick was the beneficiary.  Riechmann testified as to the details of these policies and claimed the documentation was in the same safety deposit box in which the German police found the other policies, but no actual documentation of the policies on Riechmann's life was submitted into evidence.  Moreover, the accidental death and disability policy also covered Riechmann in the same amount and actually provided for a higher payout—one million marks—in the event of total disability.

16

Riechmann agreed, as he wanted to ensure that Kischnick, not his family, would inherit his estate.

## F. Riechmann's Cell Mate

While incarcerated pending trial, Riechmann spent two months as a cellmate to Walter Symkowski. The two would play chess and discuss their lives. During the course of these conversations, Riechmann repeated to Symkowski the same version of events he told police and recounted at trial: that he and Kischnick had gotten lost and asked a black man for directions, who then shot Kischnick through the open window of the car.

However, Riechmann also told Symkowski that his girlfriend was a "[h]igh class prostitut[e]" and that he had paid a Swiss man to marry her so she could obtain a Swiss passport. Riechmann said that he never had to work because his "[g]irlfriends support him." Riechmann also expressed happiness at the prospect of becoming a millionaire from the insurance money he would receive as a result of Kischnick's death.

Riechmann denied that he had ever expressed any excitement or jubilation at the prospect of receiving insurance payouts. Riechmann claimed Symkowski had a reputation in the jail as an informant.

17

## G.  Verdict and Sentence

On August 12, 1988, after hearing testimony from over 20 witnesses over the course of a month, the jury found Riechmann guilty of first-degree murder and possession of a firearm during a criminal offense.  No evidence was presented at the penalty phase of the trial, and the jury recommended death by a nine-to-three vote.

At the sentencing hearing, after hearing argument from both sides, the state trial court issued a verbal ruling on the record.  In announcing its ruling, the state trial court noted that it had "reviewed certain papers . . . that were delivered to me by the State, the reports from Germany."  The state trial court noted that the reports concerned "people over in Germany that knew [Riechmann], knew of him." Defense counsel interrupted, informing the state trial court that he had not seen those documents and "never got any announcement from the Court as to what the Court's ruling on that matter was," apparently referring to his pretrial motion to have the state trial court review in camera the 27 missing statements from German police.  In response, the state trial court remarked that "most of the people did not know him well and if they knew him well it was years ago."  The state trial court then announced its ruling, agreeing with the jury and imposing a sentence of death.

The state trial court also issued a written sentencing order.  Having considered the statements from people in Germany who knew Riechmann, the state

18

trial court found that "non-statutory mitigation" was warranted because the statements suggested several of the people interviewed "found [Riechmann] to be a good person." However, the state trial court also found the murder was committed for pecuniary gain, and was cold, calculated, and premeditated. The state trial court ultimately concluded that "[t]he aggravating circumstances far outweigh the non-statutory mitigating circumstance," which was why it agreed with the jury's recommendation to impose a death sentence.

## H.  Direct Appeal

On direct appeal to the Florida Supreme Court, Riechmann raised several issues of trial-court and prosecutorial error, none of which is relevant to the ineffective assistance or Brady claims presently before us. The Florida Supreme Court affirmed Riechmann's convictions and sentences. Riechmann v. State, 581 So. 2d 133, 135 (Fla. 1991). The U.S. Supreme Court denied Riechmann's petition for a writ of certiorari on November 2, 1992. Riechmann v. Florida, 506 U.S. 952, 113 S. Ct. 405 (1992).

## II.  STATE POST-CONVICTION PROCEEDINGS

## A.  Rule 3.850 Motion

In 1994, Riechmann filed his first motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850. Relevant to the instant appeal, Riechmann raised two claims: (1) trial counsel failed to adequately investigate the

19

case, including the nature of Riechmann's relationship with Kischnick; and (2) the state withheld material exculpatory evidence, including interviews with 27 German and Swiss citizens taken by German police, in violation of Brady.

The ineffective assistance claim identified 15 potential witnesses, seven of whom eventually testified in person at an evidentiary hearing. As to the Brady claim, Riechmann's Rule 3.850 motion made explicit reference to four of the witnesses interviewed by German police and the statements taken by the police during the course of those interviews.

## B.  Evidentiary Hearing and Ruling

The state 3.850 court held an evidentiary hearing, at which Riechmann presented in-person testimony from seven German witnesses. These witnesses maintained they would have been willing to testify at trial had they been contacted. While several witnesses testified that Riechmann seemed to have money—because he was well dressed, paid the rent on time, or paid for dinners—none of these witnesses had personal knowledge of Riechmann's financial situation or of any actual employment. Several of the witnesses did, however, testify that Riechmann had led them to believe he worked as an insurance agent.

Two of the witnesses, Doris Dessauer and Doris Rindelaub, were former girlfriends of Riechmann and had no contact at all with Kischnick. Although she had been Riechmann's girlfriend from 1971 to 1978, Dessauer conceded she had

20

no idea "what went on in the relationship between . . . Kischnick and [Riechmann]." She admitted that she was convicted of perjury after she falsely testified on Riechmann's behalf concerning a traffic infraction.[6] For her part, Rindelaub, who dated Riechmann for six months, conceded that "there are a lot of things that [she] [didn't] know about . . . Riechmann."

Even the five witnesses who testified that Riechmann appeared to have a good or loving relationship with Kischnick conceded that their contacts with Kischnick and their observations of the couple were quite limited or not recent. For example, sisters Marlene and Monika Seeger rented one of their many apartments to Riechmann from 1984 through his conviction. Kischnick moved in with him later, and Riechmann always paid the rent on time. Yet both sisters acknowledged that they never even had a conversation with Kischnick beyond exchanging pleasantries, and their interactions with Riechmann largely were limited to brief conversations when he paid the rent.

Martin and Ulrike Karpischek, a couple who operated a high-end hair salon in Germany, also testified about their limited interactions with Kischnick. Riechmann was one of the approximately 2,500 customers at their salon. Their interactions with Kischnick primarily occurred when she came to the salon to pick

---

[6]This led to Riechmann's conviction for solicitation of perjury, which the state submitted as evidence during Riechmann's trial.

21

up Riechmann.  Kischnick had been to the salon on her own only occasionally.  Neither Martin nor Ulrike had any contact with Riechmann or Kischnick outside the salon.  Despite this limited contact, Ulrike claimed that Kischnick "had no desire to quit being a prostitute."

The last witness was Wolfgang Walitzki, a friend of Riechmann and Kischnick's.  He met the couple around 1978, and would go on day trips with them and attend dinners at their home.  While he had no direct knowledge of what Riechmann did for a living, Walitzki spoke vaguely of a business deal Riechmann had apparently entered into with an "Arabian fellow."  Once the couple moved to southern Germany, his contact with them was limited, and he could recall only one specific instance in which he had seen them in the two years preceding Kischnick's murder.[7]

----

[7]In addition to the seven witnesses who testified in person, Riechmann submitted the affidavits of eight additional witnesses who were unable to testify in person.  Riechmann offered the affidavits as evidence that would have been presented "for purposes of mitigation" during the penalty phase. The state 3.850 court admitted the affidavits solely for the purpose of determining whether counsel performed deficiently at the penalty stage, and it considered them only for that purpose.  Because we are reviewing only Riechmann's guilt-phase claims, we need not consider the content of those affidavits here.

Further, we reject Riechmann's claim that the affidavits were admitted for purposes of the guilt-phase claims too.  The record shows that, at the 3.850 hearing, the state challenged the admission of the affidavits as containing hearsay without any showing of reliability.  Riechmann's attorney responded that the statements would be "proffered as mitigation evidence" and that there were "relaxed hearsay and relaxed evidentiary standards for purposes of mitigation."  The parties specifically discussed the admissibility of the affidavits under the standard in Fla. Stat. § 921.141, which concerns sentencing proceedings for capital felonies and allows a state court to admit evidence probative of the character of the defendant regardless of its admissibility under the exclusionary rules of evidence.  After hearing the parties' arguments, the state 3.850 court admitted the affidavits into evidence as relevant to whether counsel was

As to Riechmann's <u>Brady</u> claim, the state 3.850 court also admitted five written statements taken by German police that were withheld from the defense.[8] But three of those statements came from persons who also testified in person at the evidentiary hearing, and their statements were largely repetitive of that testimony.[9] The fourth statement came from Dr. Horst Neumann, a retired physician who thought Riechmann and Kischnick, as a couple, were "financially quite well-off," in part because they offered him a generous amount to take care of their dogs when they were away on trips. Riechmann told Dr. Neumann that he had won 40,000 German marks in the lottery.[10]

---

ineffective by not investigating these potential statements prior to sentencing. The state 3.850 court noted that it was not necessary for it to conclude, at that point, whether the affidavits would necessarily have been admissible in a hypothetical sentencing proceeding.

[8]According to the state 3.850 court's order, of the 27 statements that the state failed to disclose to the defense, only five were actually introduced into evidence. The state 3.850 court's order actually references nine "reports" that were introduced, but four of the exhibits it references are not witness statements but other documentary evidence the state had in its possession.

[9]Because the statements themselves have not been provided as part of the state-court record, we rely on Riechmann's Rule 3.850 motion—which quotes extensively from the statements—in assessing the content of the withheld statements.

[10]The fifth statement was from Karl-Heinz Dreyer. Riechmann made no reference to this statement in his Rule 3.850 motion or during the course of the instant federal habeas proceeding.

The state 3.850 court also admitted several documents that the state similarly withheld. As relevant here, those documents included: (1) a letter (which we discuss later) from the company Hch. Vollenweider Truhand, dated October 25, 1985, that allegedly documents Kischnick's gainful employment in a business other than prostitution; and (2) a lottery winnings receipt.

Following the hearing, the state 3.850 court rejected the majority of Riechmann's claims, but vacated his death sentence and ordered a new sentencing hearing based on: (1) the trial judge's inappropriate ex parte communication with the prosecutor, through which the judge delegated to the prosecutor responsibility for writing the sentencing order; and (2) ineffective assistance of counsel at the penalty phase only.[11]

As to Riechmann's claim that his trial counsel was ineffective at the guilt phase, the state 3.850 court found that Riechmann failed to demonstrate prejudice resulting from trial counsel's failure to investigate and present evidence of Riechmann's relationship with Kischnick. Specifically, the state 3.850 court found that most of the evidence Riechmann identified—in-person testimony from seven of the witnesses on the list Riechmann provided to trial counsel before trial—"had already been presented to the jury, although in a manner different from now desired." It determined that counsel's decision to rely on the evidence presented at trial was a "tactical and strategic" decision that did not constitute ineffective

---

[11]In finding that Riechmann's trial counsel performed deficiently as to the penalty phase, the state 3.850 court noted that: (1) "trial counsel failed to renew or pursue his motion to obtain the German and Swiss statements which would have provided him with mitigating evidence to present to the jury"; and (2) "trial counsel's sentencing investigation was patently inadequate," and he offered no reasonable explanation for his failure to search for mitigating evidence. As a result of trial counsel's deficient performance, he "failed to unearth a large amount of mitigating evidence as to [Riechmann's] character, family history and relationship with the victim," thus prejudicing Riechmann.

24

assistance of counsel.  The state 3.850 court specifically declined to make any findings "concerning any deficiency [of defense counsel] in the guilt phase."

As to the Brady claim, the state 3.850 court found that the German witness statements were "known to the State and, without dispute, were favorable to the defense," and Riechmann "did not otherwise have ready access to the Swiss and German persons involved (even assuming he knew who they all were)."  As to materiality, the state 3.850 court found that "the State's evidentiary suppression undermines confidence in the outcome of the penalty phase, although there is no reasonable probability of a different result in the guilt phase."  Although the state 3.850 court found that "a Brady violation had occurred during the penalty phase," it ultimately said Riechmann could not raise the Brady claim in the Rule 3.850 proceeding "because it could have been raised on direct appeal."

## C.  Appeal

The state appealed to the Florida Supreme Court, challenging the state 3.850 court's decision to order resentencing, and Riechmann cross-appealed, challenging the state 3.850 court's rejection of his remaining claims as to the guilt phase.  The Florida Supreme Court affirmed the state 3.850 court's ruling, including its decision to vacate Riechmann's death sentence and to order resentencing.  State v. Riechmann, 777 So. 2d 342, 347 (Fla. 2000).

As to Riechmann's guilt-phase ineffective assistance claim, the Florida Supreme Court agreed with the state 3.850 court's finding that Riechmann failed to demonstrate prejudice because the claim "concerned evidence which was already admitted at trial, only in a different manner than now asserted." Id. at 357 ("[W]e find that the trial judge's factual findings are supported by competent and substantial evidence, and his legal conclusions are supported by our prior case law."). In particular, the Florida Supreme Court pointed to "testimony from a State's witness of Riechmann's love for Kischnick" and "a videotape of the couple the night of the murder that showed them involved in a loving relationship." Id.

The Florida Supreme Court went on to note that, in any case, "counsel could not be held ineffective for failing to present witnesses from a list withheld from him." Id. In a footnote, the Florida Supreme Court clarified that it was referring to the list of Swiss and German witnesses that the state withheld which formed the basis of Riechmann's Brady claim. Id. at 357 n.16.

In addressing the Brady claim, the Florida Supreme Court agreed with the state 3.850 court's finding that the witness statements withheld by the state "would have been material to Riechmann in the sentencing phase" and noted that "these statements will be made available to Riechmann" for "the new penalty phase." Id. at 363. Notably, however, the Florida Supreme Court did not indicate that its decision to affirm the state 3.850 court and order resentencing was based on the

Brady violation, nor did it express disagreement with the state 3.850 court's finding that the penalty-phase Brady claim was barred because Riechmann failed to raise it on direct appeal. Id. Instead, the Florida Supreme Court explicitly stated it was affirming the state 3.850 court's order "in its entirety," before specifically agreeing with the state 3.850 court's analysis concerning the ex parte communication and counsel's deficient performance during the penalty phase. Id. at 347, 348–53.

As to the guilt-phase Brady claim, the Florida Supreme Court concluded that the claim was "procedurally barred because [Riechmann] could and should have raised it on direct appeal, since by trial's end he was aware of the statements." Id. at 363. In any case, the Florida Supreme Court also explicitly agreed with the state 3.850 court's finding "that even if disclosed, there was no reasonable probability that a different result would have occurred" in the guilt phase. Id.

In the same opinion, the Florida Supreme Court also denied a separate state habeas corpus petition filed by Riechmann, in which he had raised, inter alia, the same Brady claim raised in his Rule 3.850 motion and a claim for ineffective assistance of appellate counsel. Id. at 364–66, 364 nn.21–22.

On February 1, 2010, Riechmann was resentenced to life imprisonment for first-degree murder.[12]  The Florida Third District Court of Appeal affirmed per curiam.  Riechmann v. State, 83 So. 3d 734 (Fla. Dist. Ct. App. 2012).

### III.  FEDERAL HABEAS PROCEEDINGS

#### A.  § 2254 Petition

In March 2013, Riechmann filed a counseled § 2254 petition, raising several claims, including the guilt-phase claims of ineffective assistance and Brady violations detailed above.  As to the ineffective assistance claim, Riechmann challenged the Florida Supreme Court's factual finding that the information trial counsel could have gathered from further investigation would have been cumulative.

In addressing the Florida Supreme Court's resolution of his Brady claim, Riechmann made little effort to address the Florida Supreme Court's conclusion that his Brady claim was procedurally barred.  Instead, Riechmann offered a brief argument concerning the materiality of the evidence, maintaining that the statements from the German witnesses would have undermined the state's evidence of motive during the guilt phase.  The only reference Riechmann made to

---

[12]Riechmann filed a second Rule 3.850 motion during the pendency of the appeal of the first, raising claims not pertinent to the instant appeal.  Riechmann's resentencing was stayed pending the resolution of the second motion, the denial of which was affirmed in 2007. Riechmann v. State, 966 So. 2d 298, 301 (Fla. 2007).

the Florida Supreme Court's procedural ruling was to assert, in a footnote, that "[t]o the extent that the [Florida Supreme C]ourt determined that issue is procedurally barred as it should have been raised on direct appeal, then counsel was ineffective."

## B.  Report & Recommendation, Objections, and Final Judgment

A magistrate judge prepared a report and recommendation ("R&R"), recommending that the district court deny Riechmann's § 2254 petition.  In relevant part, the magistrate judge concluded Riechmann was not entitled to federal habeas relief on his ineffective assistance claim because "[t]he Florida Supreme Court accurately stated that the [state 3.850] court's factual findings on the claim concerning Riechmann's relationship with Kischnick were supported by competent and substantial evidence, and the legal conclusions were supported by prior case law."  As to Riechmann's Brady claim, the magistrate judge concluded that the claim was procedurally barred, and Riechmann failed to show cause and prejudice sufficient to overcome that bar.  The magistrate judge further noted that Riechmann's § 2254 petition failed to provide any substantive analysis as to the Brady claim; in particular, he failed even to allege that the Florida Supreme Court unreasonably applied federal law in rejecting his Brady claim.

In his objections to the R&R, Riechmann argued for the first time that the procedural bar should not apply because the particular procedural rule invoked by

29

the Florida Supreme Court was not "adequate" to bar federal habeas relief, primarily because, he asserted, Florida courts did not consistently apply the identified procedural rule.

After considering Riechmann's objections and conducting a <u>de novo</u> review of the record, the district court affirmed and adopted the R&R, and denied Riechmann's § 2254 petition.  Riechmann appealed, and this Court granted a COA as to whether the district court had properly denied § 2254 habeas relief on Riechmann's ineffective assistance and <u>Brady</u> claims.

## IV.  DISCUSSION[13]

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides that, after a state court has adjudicated a claim on the merits, a federal court may grant habeas relief only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established [f]ederal law, as determined by the Supreme Court," or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the [s]tate court proceeding."  28 U.S.C. § 2254(d)(1), (2).

---

[13]"We review <u>de novo</u> a district court's denial of a § 2254 petition."  <u>Bester v. Warden</u>, 836 F.3d 1331, 1336 (11th Cir. 2016).  In an appeal brought by an unsuccessful habeas petition, the scope of our review is limited to the issues specified in the COA.  <u>Murray v. United States</u>, 145 F.3d 1249, 1251 (11th Cir. 1998).

The decision of a state court is "contrary to" federal law only if it "contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts." Cummings v. Sec'y for Dep't of Corr., 588 F.3d 1331, 1355 (11th Cir. 2009) (internal quotation marks omitted) (quoting Kimbrough v. Sec'y, 565 F.3d 796, 799 (11th Cir. 2009)).  A federal court making an "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable.  Bell v. Cone, 535 U.S. 685, 694, 122 S. Ct. 1843, 1850 (2002) (internal quotation marks omitted) (quoting Williams v. Taylor, 529 U.S. 362, 404–05, 120 S. Ct. 1495, 1519 (2000)).

## A.  Ineffective Assistance of Trial Counsel

Riechmann contends his trial counsel's performance at the guilt-phase of trial was constitutionally ineffective under the standards set forth in Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  Riechmann argues trial counsel failed to conduct an adequate investigation when he did not interview several German witnesses on a list that Riechmann provided to him prior to trial. "An ineffective assistance claim has two components: A petitioner must show that counsel's performance was deficient, and that the deficiency prejudiced the defense."  Wiggins v. Smith, 539 U.S. 510, 521, 123 S. Ct. 2527, 2535 (2003).

31

At the outset, we must determine whether the Florida Supreme Court's resolution of Riechmann's ineffective assistance claim is entitled to deferential review under AEDPA. Riechmann contends that we should review his ineffective assistance claim de novo because the Florida Supreme Court's conclusions regarding both deficiency and prejudice were based on an unreasonable determination of the facts in light of the evidence presented.

"Federal habeas courts generally defer to the factual findings of state courts, presuming the facts to be correct unless they are rebutted by clear and convincing evidence." Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328, 1352–53 (11th Cir. 2011) (internal quotation marks omitted) (quoting Jones v. Walker, 540 F.3d 1277, 1288 n.5 (11th Cir. 2008) (en banc)). However, "[w]hen a state court's adjudication of a habeas claim results in a decision that is based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding, this Court is not bound to defer to unreasonably-found facts or to the legal conclusions that flow from them." Id. at 1353 (internal quotation marks omitted) (quoting Jones, 540 F.3d at 1288 n.5). In such instances, we need not afford the state court's findings deference under AEDPA, and we review the underlying habeas claim de novo. Id.

As to deficient performance, Riechmann correctly notes that the Florida Supreme Court appears to have somewhat mischaracterized the basis for his

32

ineffective assistance claim in its deficiency ruling. After agreeing with the state 3.850 court's prejudice analysis, the Florida Supreme Court noted that, in any case, "counsel could not be held ineffective for failing to present witnesses from a list withheld from him" by the state. Riechmann, 777 So. 2d at 357. But the relevant list for purposes of Riechmann's ineffective assistance claim was the list he provided to defense counsel of witnesses to find and interview, not the list of witnesses interviewed by German police. And, while there was considerable overlap between the two lists, Riechmann's list included several names—including Marlene Seeger, Wolfgang Walitzki, and the Karpischeks—who were not on the state's list. Additionally, it was the statements themselves, not the list of witnesses, that the state actually withheld from the defense.

Thus, to the extent that the Florida Supreme Court based its deficient-performance ruling on its finding that defense trial counsel had no way of identifying any or all of the witnesses on the state's list who were then identified in Riechmann's 3.850 motion for relief, that ruling was based on an unreasonable determination of the facts, and it is not entitled to deferential review under AEDPA. See Cooper, 646 F.3d at 1352–53.

However, the Florida Supreme Court did not solely, or even primarily, rest its rejection of Riechmann's ineffective assistance claim on its finding that counsel did not perform deficiently. Rather, its primary basis for rejecting that claim was

33

Riechmann's failure to show that he was prejudiced by defense counsel's allegedly deficient performance.  Riechmann insists this conclusion similarly is not entitled to deferential review because the Florida Supreme Court unreasonably determined that the testimony defense counsel could have elicited from the absent witnesses would have been cumulative.

As discussed above, the Florida Supreme Court explicitly pointed to two pieces of trial evidence in support of its finding that the additional testimony defense counsel failed to present would be cumulative: the testimony of Dina Mohler—specifically her testimony that Riechmann and Kischnick loved one another—and the video the defense played for the jury, which showed Riechmann and Kischnick involved in a loving relationship.

These are, generally speaking, the sentiments Riechmann claims the absent witnesses he identifies would have communicated to the jury about the nature of Riechmann and Kischnick's relationship had trial counsel bothered to find and call them.  We acknowledge that Mohler made various concessions during her testimony—including that Riechmann did not love Kischnick "in the same way she loved him"—that undermined some of her more positive testimony.  But it remains the case that the jury was presented with testimony expressing the basic sentiments that Riechmann claims would have come from the absent witnesses he identifies.

34

A review of the evidence presented at the Rule 3.850 evidentiary hearing reveals that much of the desired testimony was repetitious and would have communicated that Riechmann and Kischnick appeared to be in a loving relationship, and that Riechmann was financially independent and did not "live off" of Kischnick's income from prostitution.  Indeed, the jury already saw firsthand from the video the nature of their relationship, loving or otherwise.  As a result, we cannot say that the Florida Supreme Court's finding that the potential additional testimony—to the extent it would have been admissible under the Florida Rules of Evidence—was cumulative is a wholly unreasonable determination of the facts in light of the evidence presented.  See 28 U.S.C. § 2254(d)(2); Cooper, 646 F.3d at 1352–53.

Additionally, our exhaustive review of the record reveals that other state witnesses offered testimony—on both direct and cross-examination—that similarly undermined the state's theory of motive, particularly as it concerned Riechmann's financial situation.[14]  For example, at trial, Steffen testified that he helped Riechmann rent a luxury apartment by verifying a certificate of earnings showing Riechmann's monthly income.  Steffen also stated, like several of the witnesses

---

[14]While the Florida Supreme Court pointed to only two pieces of evidence—a fact Riechmann focuses on in his brief—it specifically stated that those pieces of evidence were merely examples of evidence that accomplished the same purpose as the 3.850 testimony Riechmann asserted would have been elicited from the absent witnesses he identified.

35

who testified at the 3.850 evidentiary hearing, that Riechmann claimed to have been trained as an insurance agent.

Kischnick's sister, Regina, recalled Kischnick telling her that Riechmann had "business dealings with Arabs," testimony that mirrors statements presented in the evidentiary hearing concerning Riechmann's dealings with Saudi businessmen. On cross-examination, Regina also conceded that Riechmann and Kischnick's lavish lifestyle likely was not supported by Kischnick's income alone. Thus, the jury was hardly deprived of testimony concerning Riechmann's sources of income beyond Kischnick's prostitution.

Riechmann also had the opportunity to explain the nature of his relationship with Kischnick and the source of his financial success to the jury when he testified in his own defense. For example, Riechmann explained that, far from forcing Kischnick to engage in prostitution, he had in fact bought her freedom from other pimps on two occasions.

In any case, even assuming that we found the Florida Supreme Court's finding that the proffered evidence was cumulative to be unreasonable and reviewed Riechmann's ineffective assistance claim de novo, we would nonetheless affirm on the ground that Riechmann failed to demonstrate prejudice resulting from trial counsel's deficient performance.

36

Assuming the testimony Riechmann relies on would have been admissible at trial to rebut the state's theory of motive, there is no reasonable probability that admission of that testimony would have changed the outcome at trial. See Strickland, 466 U.S. at 694, 104 S. Ct. at 2068 (To demonstrate prejudice, a petitioner must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.").

As Riechmann acknowledges, the 3.850 testimony and evidence he claims competent counsel would have elicited from the identified witnesses would have been in response to only the state's evidence of motive. The absent testimony therefore would have done nothing to undermine the state's circumstantial forensic evidence, which included the following: (1) bullets recovered from Riechmann's motel room matched the type used to kill Kischnick; (2) Riechmann possessed two of the only three models of guns that could have been used to kill Kischnick; (3) the presence of gunshot residue on Riechmann's hands that, according to the state's expert, established to a reasonable degree of scientific certainty that he had fired a gun; and (4) blood splatter evidence that, according to the state's expert, was inconsistent with Riechmann's claim that he was in the car when Kischnick was shot.

Moreover, even as to the state's theory of motive, the 3.850 testimony that would have been elicited from the witnesses Riechmann identifies was weak and

would not have effectively undermined the state's motive theory. Of the seven witnesses whose testimony Riechmann presented at the evidentiary hearing before the state 3.850 court, only Wolfgang Walitzki appears to have spent any significant time with Riechmann and Kischnick as a couple. Both Marlene and Monika Seeger confessed that they never had an actual conversation with Kischnick beyond exchanging pleasantries, and their interactions with Riechmann were largely confined to the times when he would come to pay his rent. Their respective impressions of Riechmann and Kischnick's relationship were formed through observing the couple's rapport "from a distance."

Similarly, the Karpischeks, whose testimony Riechmann repeatedly references on appeal, both admitted that their interactions with Riechmann and Kischnick as a couple primarily occurred when Kischnick would come to pick up Riechmann from his hair appointments. Notably, they had no contact with Riechmann or Kischnick outside of the salon. Riechmann makes much of Ulrike Karpischek's testimony that she knew "for a fact" that Kischnick "had no desire to quit being a prostitute." But Ulrike provided no basis for her purported intimate knowledge of Kischnick's "desire[s]." Rather, her testimony revealed that both she and her husband had limited contact with Riechmann and Kischnick, who, after all, were but two of the Karpischeks approximately 2,500 customers.

38

Doris Dessauer and Doris Rindelaub, Riechmann's former girlfriends, admitted they had never met Kischnick, and both testified they had barely heard from or seen Riechmann in many years. As to Walitzki, while he at least testified to a friendship with Riechmann and Kischnick, even he acknowledged that he had lost contact with them once they relocated to southern Germany in the years immediately preceding Kischnick's murder.

As for the testimony concerning Riechmann's financial situation, none of the seven witnesses testified to having any <u>direct</u> knowledge of Riechmann's finances or his various business ventures. Rather, they testified that they simply <u>believed</u> him to be financially secure because he generally appeared to be well off, dressed well, did not have trouble making rent payments, often picked up the tab at dinner, and spoke vaguely of his business activities. Importantly, these observations are not even necessarily inconsistent with the state's theory. The fact that Riechmann appeared to be well-off does not preclude the possibility that his financial comfort was due, at least in part, to Kischnick's income from prostitution.

Several of the seven witnesses also testified that Riechmann had represented to them that he was an insurance salesman. The ostensible benefit of such testimony at trial would have been to indicate to the jury that Riechmann had an independent source of income and therefore did not need the income from Kischnick's prostitution. But Riechmann himself at least partially contradicted this

39

testimony in his own trial testimony, during which he claimed he was able to support himself largely through commodities trading and admitted to lying, in a loan application, about working for an insurance company.

What's more, the jury still would have been presented with evidence of the reciprocal wills and insurance policies on Kischnick's life from which Riechmann stood to benefit. That Riechmann stood to profit greatly from Kischnick's death—to the tune of over $961,000 in U.S. dollars—was further evidence of motive that the testimony of Riechmann's German acquaintances would have done little to counteract. And, in fact, Riechmann did attempt to collect on a number of the policies following Kischnick's murder. The jury also heard from Riechmann's cell mate that Riechmann expressed happiness at the prospect of becoming a millionaire from the insurance money he would receive.

On balance then, we are convinced that whatever marginal benefit would have accrued to Riechmann as a result of the 3.850 testimony did not create a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." See Strickland, 466 U.S. at 694, 104 S. Ct. at 2068.

## B. Brady Violation

Riechmann also contends that the state's withholding of the statements of 27 Swiss and German citizens was violative of Brady v. Maryland. Before we address

40

the merits of this claim, we must first consider whether the district court properly found that his Brady claim was procedurally barred. Riechmann asserts that we should review his Brady claim on the merits because the procedural bar invoked by the Florida Supreme Court was not actually adequate to bar his claim.

## 1. Procedural Bar

"A state habeas corpus petitioner who fails to raise his federal claims properly in state court is procedurally barred from pursuing the same claim in federal court absent a showing of cause for and actual prejudice from the default." Bailey v. Nagle, 172 F.3d 1299, 1302 (11th Cir. 1999). Thus, where a state court "clearly and expressly" rests its rejection of a claim on a procedural bar, and that bar "provides an adequate and independent state ground for denying relief," federal review of that claim is barred by the procedural default doctrine. Atkins v. Singletary, 965 F.2d 952, 956 (11th Cir. 1992) (internal quotation marks omitted) (quoting Johnson v. Singletary, 938 F.2d 1166, 1173 (11th Cir. 1991) (en banc)). A state procedural rule is not "adequate" to bar federal habeas review when it is not "strictly or regularly followed" by the state courts. Hathorn v. Lovorn, 457 U.S. 255, 263, 102 S. Ct. 2421, 2426 (1982) (internal quotation marks omitted) (quoting Barr v. City of Columbia, 378 U.S. 146, 149, 84 S. Ct. 1734, 1736 (1964)).

41

Here, the Florida Supreme Court "clearly and expressly" rested its rejection of Riechmann's guilt-phase Brady claim on a state procedural bar, pursuant to which issues that were or could have been raised on direct appeal are barred in state post-conviction proceedings.  Riechmann, 777 So. 2d at 363 (citing Francis v. Barton, 581 So. 2d 583 (Fla. 1991)).  Because Riechmann could have raised his Brady claim on direct appeal—a finding he has not contested—the Florida Supreme Court determined the claim was barred.  Id.

Riechmann continues to insist that this procedural rule is not "strictly or regularly followed."  Riechmann's primary, if not only, basis for this assertion is that the Florida Supreme Court did not apply the rule consistently within his case. Riechmann argues that, had the Florida Supreme Court been consistent, it would similarly have rejected his penalty-phase Brady claim on the same procedural ground, which it did not.  We find this argument lacks merit, as it is based on a fundamental misreading of the Florida Supreme Court's opinion.  In discussing the statements in question, the Florida Supreme Court correctly noted that "the [state 3.850] court found that these statements would have been material to Riechmann in the sentencing phase because they would have allowed counsel the opportunity to present some mitigating evidence."  Riechmann, 777 So. 2d at 363.  It went on to say it agreed with that determination and that the statements would be made available to Riechmann "for the new penalty phase."  Id.

42

Riechmann characterizes these statements as the Florida Supreme Court granting him relief as to his penalty-phase Brady claim.  Not so.  The Florida Supreme Court at no point stated that its affirmance of the state 3.850 court's decision ordering resentencing was based on the Brady claim.  Rather, it merely expressed agreement with the state 3.850 court's finding that the statements were Brady material that would need to be turned over during the subsequent resentencing.  Id.

Moreover, the Florida Supreme Court expressly stated that it "affirm[ed] the [state 3.850] court's order in its entirety" before specifically discussing the state 3.850 court's two actual bases for ordering resentencing—ineffective assistance and improper ex parte communications between the sentencing judge and the prosecutors.  Id. at 347–53 (emphasis added).  While the Florida Supreme Court did not explicitly agree with the state 3.850 court's ruling that the penalty-phase Brady claim was procedurally barred, it did note that the state 3.850 court had "denied the remainder of Riechmann's claims," and expressed no disagreement with any part of that decision.  Id. at 348.

Riechmann claims that the Florida Supreme Court implicitly ruled on the penalty-phase Brady claim when it ordered that the previously withheld statements be made available at his resentencing.  According to Riechmann, had the Florida Supreme Court applied the procedural bar to his penalty-phase claim, it would not

43

have had any reason to comment on the materiality of the statements.  "Rather, it would have rejected the claim entirely, and . . . Riechmann would have had to proceed at his penalty retrial without the statements."  This is incorrect.

Both the state 3.850 court and the Florida Supreme Court acknowledged that the state likely violated Brady at the penalty phase by withholding the statements, but neither was willing to grant relief on that basis due to the procedural bar.  This did not somehow relieve the state of its obligation to comply with Brady during the new penalty trial, regardless of whether the new sentencing proceeding was based on its prior failure to do so.  There is no inconsistency to be found in a court acknowledging that an otherwise procedurally barred claim is or may be meritorious.

Because Riechmann's argument that the Florida Supreme Court did not "strictly or regularly follow[]" its own procedural rule in its opinion is without merit, we conclude that the district court properly deferred to that procedural ruling, and Riechmann may maintain a claim for federal habeas relief only if he can show cause and prejudice to excuse his failure to properly exhaust his guilt-phase Brady claim.  Bailey, 172 F.3d at 1302.

However, Riechmann likely has abandoned any argument regarding the district court's finding that he failed to sufficiently allege that he could show cause and prejudice sufficient to overcome the procedural default.  In his initial brief on

44

appeal, Riechmann focuses his argument concerning procedural default solely on whether the procedural bar invoked by the Florida Supreme Court was adequate to bar relief. This is despite clear language in this Court's COA order stating that "[w]hile the district court correctly determined that Riechmann's Brady claim was procedurally defaulted, . . . reasonable jurists could debate the district court's further determination that he failed to overcome that default."

Because Riechmann has failed to plainly and prominently offer any argument as to whether he established cause and prejudice to excuse the procedural default of his Brady claim, he has effectively abandoned the claim. See United States v. Jernigan, 341 F.3d 1273, 1283 & n.8 (11th Cir. 2003) ("Under our caselaw, a party seeking to raise a claim or issue on appeal must plainly and prominently so indicate. Otherwise, the issue—even if properly preserved at trial—will be considered abandoned."). Riechmann does argue in his reply brief that he can demonstrate cause and prejudice, but "[a]rguments raised for the first time in a reply brief are not properly before a reviewing court." Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005) (alteration in original) (quoting United States v. Coy, 19 F.3d 629, 632 n.7 (11th Cir. 1994)).[15]

---

[15]Riechmann's failure to properly raise his argument concerning cause and prejudice provides a sufficient basis for us to affirm the district court, but we note that, in any case, he would be unable to overcome the procedural default. While his appellate counsel's failure to raise any Brady issue on appeal was likely sufficient cause for Riechmann's failure to properly exhaust his guilt-phase Brady claim, he cannot demonstrate prejudice because, as we discuss below, the Brady claim ultimately is without merit.

Although we conclude that the district court properly determined that Riechmann's Brady claim was procedurally defaulted, we will briefly address the substance of the underlying Brady claim, which we alternatively find lacks merit.

## 2. Merits

As with his ineffective assistance claim, Riechmann asserts that we should review de novo the merits of his underlying Brady claim, this time because the Florida Supreme Court invoked a procedural bar to reject his Brady claim, and the Brady claim therefore has not been "adjudicated on the merits" such that we must defer to that adjudication under AEDPA. See 28 U.S.C. § 2254(d); Conner v. Hall, 645 F.3d 1277, 1292 (11th Cir. 2011) (stating that where a claim was "never adjudicated on the merits in state court because of the state court's determination that . . . [the] claim was procedurally barred," a federal habeas court "is not bound by AEDPA's deferential standards in 28 U.S.C. § 2254(d) and federal court review is de novo").

Riechmann overlooks the fact that the Florida Supreme Court offered an alternative merits ruling on his Brady claim. After noting that the Brady claim was barred due to Riechmann's failure to raise it on direct appeal, the Florida Supreme Court stated that "[n]otwithstanding [the procedural default], the [state 3.850] court found that even if disclosed, there was no reasonable probability that a different result would have occurred. We agree." Riechmann, 777 So. 2d at 363. In other

46

words, the Florida Supreme Court alternatively ruled on the merits of Riechmann's

Brady claim, concluding that the statements withheld by the state did not meet

Brady's materiality standard.  This "alternative holding on the merits" constitutes

"an 'adjudication on the merits' within the meaning of § 2254(d)," and we may not

grant federal habeas relief unless the state unreasonably applied Brady.  See

Loggins v. Thomas, 654 F.3d 1204, 1219 (11th Cir. 2011); see also 28 U.S.C.

§ 2254(d)(1).  Here, we cannot say that the Florida Supreme Court's application of

Brady was unreasonable given the facts before it.

> To establish a Brady violation, a defendant must show that
>
> (1) the government possessed favorable evidence to the defendant; (2) the defendant does not possess the evidence and could not obtain the evidence with any reasonable diligence; (3) the prosecution suppressed the favorable evidence; and (4) had the evidence been disclosed to the defendant, there is a reasonable probability that the outcome would have been different.

United States v. Stein, 846 F.3d 1135, 1145–46 (11th Cir. 2017) (quoting United

States v. Vallejo, 297 F.3d 1154, 1163 (11th Cir. 2002)).  That last component, the

materiality inquiry, should focus on  "whether 'the favorable evidence could

reasonably be taken to put the whole case in such a different light as to undermine

confidence in the verdict.'"  Id. at 290, 119 S. Ct. at 1952 (quoting Kyles v.

Whitley, 514 U.S. 419, 435, 115 S. Ct. 1555, 1566 (1995)).  "The evidence rises to

the level of materiality within the meaning of Brady when there is a reasonable

probability that, had the suppressed evidence been disclosed, the result of the

proceeding would have been different." Rimmer v. Sec'y, Fla. Dep't of Corr., 876 F.3d 1039, 1054 (11th Cir. 2017). In making this determination, we must consider the "totality of the circumstances" and "'evaluat[e]' the withheld evidence 'in the context of the entire record.'" Id. (alteration in original) (internal quotation marks omitted) (quoting Turner v. United States, 582 U.S. ___, 137 S. Ct. 1885, 1893 (2017)).

Before delving into the analysis of Riechmann's Brady claim, we more clearly identify the alleged Brady material under consideration here. It is somewhat unclear from the state court record and the parties' briefs on appeal whether Riechmann's Brady claim is based on the state's failure to disclose the existence of all the witnesses identified and interviewed by German police in addition to the actual statements those witnesses gave. To the extent Riechmann claims the list of witnesses' names is itself Brady material, he cannot reasonably claim that he could not locate those witnesses on his own. See Stein, 846 F.3d at 1146 (finding no Brady violation where the defendant can "locate [the evidence] with reasonable diligence").

For example, the four witnesses explicitly referenced in Riechmann's brief and in his underlying state post-conviction motion—Doris Dessauer (or Röhn), Monika Seeger, Doris Rindelaub, and Dr. Horst Neumann—all were on the handwritten list of people in Germany to contact that Riechmann gave his defense

48

counsel prior to trial.  Moreover, testimony at the evidentiary hearing indicates that defense counsel was in possession of the list itself pretrial, and was merely seeking the disclosure of the statements and reports from German police that the state had in its possession.  Accordingly, we limit our analysis here to the materiality of the statements themselves, along with the other documentary evidence referenced in Riechmann's Rule 3.850 motion and presented to the state 3.850 court at the evidentiary hearing.

Moving on to the substance of Riechmann's Brady claim, we will assume that Riechmann has satisfied Brady's first two requirements.  See Strickler, 527 U.S. at 281–82, 119 S. Ct. at 1948.  Our concern, then, is whether the withheld evidence was "material"—that is, whether "there is a reasonable probability that, had the suppressed evidence been disclosed, the result of the proceeding would have been different."  See Rimmer, 876 F.3d at 1054.

As to the statements themselves, Riechmann has only ever referenced the specific contents of four.  Two of the statements came from Riechmann's former girlfriends (Doris Dessauer and Doris Rindelaub), one came from his former landlady (Monika Seeger), and the last came from a friend who took care of his dogs (Dr. Neumann).

Assuming the statements would have been admissible under Florida law, the Florida Supreme Court's conclusion that the statements would likely not have

49

affected the outcome at trial is not unreasonable.  Like the would-be testimony we discussed above in evaluating Riechmann's ineffective assistance claim, the undisclosed statements would have undermined mainly the state's evidence of motive, and only to a limited degree.

Two of the witnesses whose statements were not disclosed—Doris Dessauer and Doris Rindelaub—were former girlfriends of Riechmann who had never even met Kischnick and had no idea what went on in their relationship.  Indeed, neither woman had been in contact with Riechmann since their respective relationships with him ended, many years prior to the murder.  Riechmann's landlady, Monika Seeger, had very little contact with Kischnick and acknowledged that she and her family did not have a close relationship with the couple.

The fourth statement came from Dr. Neumann, whose statement appears to have exclusively concerned his impressions of Riechmann's financial situation.  But his impressions were primarily based on how much Riechmann paid Dr. Neumann for taking care of his dogs and on the fact that Riechmann had recently won 40,000 German marks in the lottery.  Notably, the mere fact that Riechmann won the lottery obviously was not information unknown to the defense at the time of trial.  See Stein, 846 F.3d at 1146.  In any case, all of these statements come nowhere close to undermining the state's powerful evidence of Riechmann's motive to kill Kischnick.  Simply put, it was not unreasonable for the Florida

50

Supreme Court to conclude that, in the context of the entire record, there was no reasonable probability of a different outcome.  See Rimmer, 876 F.3d at 1054.

As for the remaining withheld evidence, Riechmann focuses particularly on a letter, purportedly from Kischnick's employer, dated October 25, 1985, which he claims would have undermined the state's theory that Riechmann would have been upset that Kischnick was quitting prostitution, as it showed she had an alternate source of income.  Riechmann greatly overstates the value of this letter, assuming he has accurately described its contents.  The fact that Kischnick had other sources of income does not preclude her having been a prostitute, nor does it flatly contradict any testimony about the amount of money she made as a prostitute.  Further, Riechmann himself acknowledged during his testimony that Kischnick had worked as a prostitute at various points in time.  Accordingly, the mere existence of some alternative source of income would hardly have undercut the state's theory that Riechmann was upset by Kischnick's desire to give up her lucrative job as a prostitute.

For all these reasons, the Florida Supreme Court's decision denying Riechmann's Brady claim is not based on an unreasonable determination of the facts and is not contrary to, or an unreasonable application of, clearly established federal law, and we therefore defer to that decision.

51

## V.  CONCLUSION

For the foregoing reasons, we affirm the district court's denial of

Riechmann's § 2254 petition.

**AFFIRMED.**